**Christopher James BECK, Petitioner,**

v.

**Ronald J. ANGELONE, Director of the Virginia Department of Corrections, Respondent.**

**No. CIV. A. 2:99CV855.**

United States District Court,
E.D. Virginia.
Norfolk Division.

Sept. 27, 2000.

Andrew A. Protogyrou, Protogyrou & Rigney, Monticello Arcade, VA, Douglas Fredericks, Norfolk, VA, for Petitioner.

Robert Q. Harris, Office of the Attorney General, Richmond, VA, for Respondent.

## ORDER AND OPINION

FRIEDMAN, District Judge.

This matter was initiated on October 1, 1999, by a petition for a writ of habeas corpus under 28 U.S.C. § 2254 filed by Christopher Beck (the petitioner). Following Beck's pleas of guilty to capital murder on May 15, 1996, and other crimes pursuant to the terms of a plea memorandum, he was convicted of three counts of capital murder, and on August 15, 1996, he was sentenced to death.[1] The Section 2254 petition alleges violations of the federal rights pertaining to Beck's plea of guilty and subsequent conviction, and his sentencing in the Circuit Court of Arlington County, Virginia. Specifically, Beck attacks the validity of his plea of guilt based on several separate grounds.

## FACTUAL BACKGROUND

The facts relating to Beck's murder of three Virginia residents, Florence Marks, William Miller and David Kaplan, have been fully set forth by the Supreme Court of Virginia in *Beck v. Commonwealth*, 253 Va. 373, 484 S.E.2d 898 (1997), *cert. denied*, 522 U.S. 1018, 118 S.Ct. 608, 139 L.Ed.2d 495 (1997), and by Magistrate Judge Prince in his May 2000 Report and Recommendation (R & R) currently before this Court.[2] Because the following review of Beck's claims of ineffective assistance of counsel and actual innocence requires some understanding of the facts and timing of the murders, however, the Court will briefly provide a summary here (based on the previous opinions and the facts before the trial judge contained in the record) in addition to that already set forth by the Magistrate Judge and the Supreme Court of Virginia.

On June 5, 1995, Christopher Beck arrived in Arlington, Virginia, from Pennsylvania with the intent to kill William Miller, his previous employer and landlord, and a man that Beck believed had made sexual advances toward him in the past. Miller resided in Arlington with David Kaplan and Florence Marks (coincidentally Beck's cousin). The following morning, June 6, 1995, Beck arrived at Miller's residence, but none of the occupants were home; presumably all had left for their respective jobs. Beck broke into the basement floor of the house through a window and proceeded to Miller's room, where he retrieved a gun. Beck was aware that Miller collected both expensive bicycles and expensive guns. Beck then returned to the basement where he waited in the laundry room for Miller to return from work. Early that evening, Beck heard someone entering the laundry room and raised the gun to arm level. When the door opened he shot the gun, believing it to be Miller returning from work. However, Beck was mistaken, and instead he shot Florence Marks two times in the head. According to Beck, in an attempt to cover-up the motive of murder, he removed Marks' lower body clothing, stabbed her in the buttocks and penetrated her vagina with a hammer. Beck claims that he threw a condom he had found in the washer onto the floor near Marks to make it appear that she had been raped by a stranger.

---

1. As set forth in detail below, Beck additionally pled guilty initially to one count of capital murder of the three victims as part of a single transaction in violation of Va.Code § 18.2–31(7). However, that plea was later withdrawn and the charge was nolle prossed.

2. The Magistrate Judge's Report and Recommendation (R & R) (filed May 5, 2000) contains a detailed statement of the facts, which this Court adopts in its entirety.

Beck waited for Miller to return to the residence. Following his day at work, Miller returned home on his bicycle. Beck waited inside the house. When Miller entered and proceeded up the stairs, Beck shot Miller in the face and elsewhere numerous times. Beck explained to the police that he turned Miller onto his stomach and covered him with a blanket to avoid looking at him after he had been shot. Beck remained in the house and eventually, Kaplan, the third housemate arrived home from work. When Kaplan entered the house, he apparently saw Beck and the then-dead Miller, and Beck proceeded to shoot Kaplan in the head as well. According to Beck, Kaplan did not die immediately, and as a result Beck shot him numerous times. Beck explained that Kaplan continued to talk to Beck after he had been shot in the back of the head. Beck claims that he finally stabbed Kaplan in the head, and then Kaplan finally stopped talking. After Kaplan died, Beck went through the house and removed money from the wallets of each of the victims. Consistent with Beck's statements, at the scene of the crime the police found Kaplan's emptied wallet at his feet, Miller's fanny-pack on the nearby sofa with the contents spread on the sofa and containing no money, and Marks' purse upstairs in the house absent any money. *See* Transcript of Plea (May 1996) (statement of prosecutor); Respondent's Ex. E filed with Supreme Court of Virginia (Beck's Statement to Police) at 23–25 (including statement that he took Marks' purse upstairs following her murder). Beck exited the house taking the victims' money, and Miller's car, bicycles and guns. Following a brief diversion in Washington, D.C., Beck returned to Pennsylvania with the guns, bicycles and car he stole from the house.

After a short and successful investigation, on June 8, the police arrived at Beck's Pennsylvania home and questioned him regarding the murders of Miller, Marks and Kaplan. Beck initially denied the murders claiming that during the time of the murders he was transporting bicycles from Tennessee to Pennsylvania. Beck advised the police that the bicycles he had transported were stored at . a friend's house. The police proceeded to the friend's house, where the friend failed to corroborate Beck's story. At that point, Beck admitted to the police his involvement in the three murders. Beck was arrested and transported to Arlington where he gave a full confession. The police tape recorded Beck's statements, which are now transcribed and part of the record in this proceeding.

## PROCEDURAL BACKGROUND

Beck was arraigned and counsel was appointed for Beck in state court. *See* Va. S.Ct. Order on Beck's second habeas petition (April 28, 2000). Beck's counsel filed a motion to suppress all statements made by him to the police; however, the motion was denied by the trial court. A clinical psychologist, Dr. Evan Nelson, was appointed to assist the defense. On May 15, 1996, Beck plead guilty to four counts of capital murder, one count each of statutory burglary and rape, three counts of robbery and seven offenses of the use of a firearm. However, Beck's counsel ultimately requested to withdraw Beck's guilty plea as to the charge of multiple homicide capital murder, and the Commonwealth nolle prossed that charge. *See Clagett v. Commonwealth*, 252 Va. 79, 94, 472 S.E.2d 263, 272 (1996) (decided June 7, 1996) (vacating a charge of multiple homicide capital murder as derivative to capital murder during commission of a robbery), *cert. denied*, 519 U.S. 1122, 117 S.Ct. 972, 136 L.Ed.2d 856 (1997).

Nevertheless, Beck faced the death penalty for the three remaining pleas to the three counts of capital murder. To prepare for sentencing, Beck's counsel received assistance from various court-appointed professionals, including Dr. Nelson, a clinical psychologist. After a review of the evidence, on August 15, 1996, Beck was sentenced to death by the trial

court judge on the three remaining counts of capital murder. Beck was additionally sentenced on the underlying counts of rape, robbery, burglary, use of a firearm during commission of a murder, and use of a firearm during the commission of a rape. The trial court judge made findings of both vileness and future dangerousness.

Beck directly appealed his sentence to the Supreme Court of Virginia, which issued its decision affirming the sentence on April 18, 1997. *Beck v. Commonwealth,* 253 Va. at 388, 484 S.E.2d 898. As set forth above, on December 8, 1997, the United States Supreme Court denied certiorari of the direct appeal. *Beck v. Virginia,* 522 U.S. 1018, 118 S.Ct. 608, 139 L.Ed.2d 495 (1997). On February 6, 1998, Beck filed his first habeas petition in state court; however, that petition violated certain procedural rules. Therefore, on September 3, 1998, Beck filed a "Supplemental Petition for Writ of Habeas Corpus," in which he set forth numerous claims for relief. On January 28, 1999, the Supreme Court of Virginia denied the petition in its entirety. No evidentiary hearing was provided for the state habeas proceeding. On April 16, 1999, the Supreme Court of Virginia denied Beck's request for rehearing on the petition, and Beck's execution was set for June 10, 1999.

On June 7, 1999, this Court had its first involvement in this case by staying Beck's execution pending consideration of a federal habeas petition. *See* Docket No. 6. On July 23, 1999, the Court granted Beck's motion for the appointment of experts (a neurologist and psychiatrist) to investigate and prepare Beck's habeas claims. As a result, Dr. Manscheim and Dr. Pelligrino were appointed. On October 1, 1999, Beck filed his federal habeas petition currently before the Court, and along with it, he filed three motions for relief. This matter was referred to United States Magistrate Judge William Prince pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure,

and Rule 29 of the Rules of the United States District Court for the Eastern District of Virginia for a R & R.

On January 3, 2000, Magistrate Judge Prince denied the three motions filed by Beck simultaneous with his petition: Beck's motion to expand the record (with three affidavits); Beck's request for discovery; and Beck's motion and request for a hearing. *See* Docket Number 43. On March 29, 2000, this Court ruled on Beck's objections to Judge Prince's Order accepting the Order in its entirety. *See* Docket Number 50.

In the interim period, on February 4, 2000, Beck filed a second Writ of Habeas Corpus with the Supreme Court of Virginia, alleging lack of jurisdiction in Arlington County Circuit Court, arguing that he had not been arraigned there due to the fact that the indictment was allegedly not read during the arraignment. On April 28, 2000, the Supreme Court of Virginia denied the petition finding that Beck had been properly arraigned in Arlington County Circuit Court. Additionally, the Supreme Court of Virginia found that the petition was untimely.

The Magistrate Judge's final R & R was filed on May 5, 2000, recommending that the petition for habeas corpus be denied and dismissed. *See* Docket Number 57. By copy of the R & R, each party was advised of his or her right to file written objections to the findings and recommendations made by the Magistrate Judge. On May 30, 2000, this Court received the Beck's objections to the R & R. *See* Docket Number 61. Additionally on May 30, Beck filed a "Second Request for an Evidentiary Hearing on the Issue of Ineffective Assistance of Counsel," his second "Request to Expand the Record Pursuant to Rule 7," a "Request for Hearing on the Issue of Mr. Beck's Competency at the Time of Sentencing," and a "Request for Oral Argument." *See* Docket Numbers 62–65. The respondent, Angelone, did not file objections to the R & R, but he responded to Beck's objections on June 14,

2000. *See* Docket Number 67. Additionally on June 14, the respondent filed an opposition to Beck's motions filed on May 30. *See* Docket No. 66.

■ Beck has objected to each of the Magistrate Judge's recommendations to deny the claims set forth in his petition for a writ of habeas corpus. The Court, having reviewed the record in its entirety, shall make a de novo determination of the portions of the R & R to which Beck objects. In doing so, the Court will follow the basic organization of the R & R focusing on those sections of the R & R to which Beck objects. Pursuant to 28 U.S.C. § 636(b)(1), the Court may accept, reject or modify, in whole or in part, the recommendation of the Magistrate Judge, or it may recommit the matter to him with instructions. Additionally, Beck's renewed request for a hearing is addressed below.

## DISCUSSION

### I. *Preliminary Objections*

Beck raises at least two objections which do not correspond with the Magistrate Judge's actual review of a particular claim in the petition, but relate to underlying findings that made in the R & R.

#### A. *"Alford Pleas"*

■ In the R & R's Section of the Procedural Background of the case, the Magistrate Judge correctly described the procedural background and the fact that Beck entered an *"Alford* plea" to the charge of rape and to the charge of use of a firearm in the commission of a rape. *See* R & R at 2 and 26, n. 7. An *"Alford* Plea" indicates that a defendant pleads guilty while protesting his or her innocence. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (finding no constitutional error in accepting guilty plea on count where defendant maintained his innocence). With regard to Beck's Claim A (the sufficiency of the evidence), the Magistrate Judge found that Beck had entered pleas before the Circuit Court of Arlington County. In opposition to the respondent's motion to dismiss, Beck argues that he did not actually plead guilty in Circuit Court. *See* R & R at pp. 27 n. 7 and 27 n. 8. Beck objects on the same basis arguing that "[a]t no time in the colloquy did Mr. Beck indicate he was pleading guilty, nor at any time did the court indicate that an "Alford plea" was a plea of guilty." *See* Objections at 1. Based on the same reasoning, Beck contends that the Circuit Court did not accept Beck's pleas of guilty. *Id.* at 2.

#### B. *Beck's Successive State Habeas Petition*

As a procedural matter, Beck additionally objects to the Magistrate Judge's omission from the Procedural Background of the R & R reference to Beck's argument advanced in his second state habeas petition (filed February 4, 2000) that he was not properly arraigned in state court, and therefore that the trial court lacked jurisdiction. These arguments were raised for the first time in Beck's federal habeas petition. Then, on February 4, 2000, while this federal habeas was pending, Beck filed a second state habeas petition raising the claims regarding the adequacy of Beck's arraignment, or lack thereof. The Supreme Court of Virginia dismissed the second petition on April 28, 2000. Beck now asserts that the Supreme Court's ruling of April 28 does not constitute a binding ruling of procedural default in state court. This Court finds no error in the Magistrate Judge's omission of the procedural history of this case of Beck's second and successive habeas petition. Additionally, the Court finds that the Supreme Court of Virginia's decision on the second petition does constitute a ruling as to the procedural default of the claims raised in Beck's second state petition.

### II. *Analysis of Exhaustion, Procedural Default and Standards of Review*

#### A. *Waiver of Exhaustion Defense*

■ Beck objects generally to any consideration of the issue of exhaustion raised

by the respondent. Specifically, Beck argues that the Commonwealth waived the defense of exhaustion as to each of the habeas claims when the respondent stated in the motion to dismiss that "all of Beck's claims are 'exhausted' within the meaning of 28 U.S.C. § 2254(b)." Based on this statement by the respondent, Beck argues that the respondent cannot now rely on the doctrine of exhaustion as to the claims. The respondent denies that it waived the defense of exhaustion and recites the full paragraph that Beck's contends constitutes a waiver, arguing that the paragraph is merely a statement of the law. Whether exhaustion has been waived, the alleged "waiver" does not apply to the defense of procedural default. However, in this case, the Court cannot find based on the statements made that exhaustion has been "waived" by the Commonwealth.

### B. *Procedural Default*

▇▇▇ In the R & R, the Magistrate Judge correctly set forth the rule of law that federal courts may not entertain a federal habeas petition unless the petitioner has previously complied with the state procedures in exhausting state remedies. *See Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The rule, known as "the adequate and independent state grounds rule," is such that if the state reviewing court denies a petitioner's claim based on a rule of default regularly applied in state court, then the petitioner cannot obtain federal review on the correlative federal claim. *Id.; see also Burket v. Angelone*, 208 F.3d 172, 188 (4th Cir.2000), *cert. denied*, —— U.S. ——, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2000). As the Supreme Court has noted, without such a rule federal habeas proceedings would offer a state prisoner the opportunity to undermine the state enforcement of its rules and laws. *Coleman v. Thompson*, 501 U.S. 722, 730–31, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Therefore, absent a showing of cause and prejudice or actual innocence, the federal court will dismiss with prejudice a claim that has been procedurally defaulted in

state proceedings. *See Burket*, 208 F.3d at 183; *Wright v. Angelone*, 151 F.3d 151, 159 (4th Cir.1998).

Two separate rules of procedural default were applied by the Supreme Court of Virginia in Beck's state habeas proceedings. First, the Supreme Court dismissed claims pursuant to *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680, 682 (1974) (barring state habeas review where the claim was not raised at the trial or on direct review), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975). Beck argues that the Supreme Court did not actually apply the rule from *Slayton* as to the ineffective assistance of counsel claims.

▇▇▇ Second, the Supreme Court applied the procedural default rule of *Anderson v. Warden*, 222 Va. 511, 281 S.E.2d 885 (1981), which provides that an accused who enters a guilty plea is bound by the representations at trial regarding the voluntariness of the plea. *Id.* Beck objects to the Magistrate Judge's treatment of the Supreme Court of Virginia's *Anderson* decision and insists that the Court review the merits of the Supreme Court's ruling as a substantive ruling, rather than a procedural ruling (as suggested by the respondent). The Magistrate Judge's ambivalence regarding the Supreme Court of Virginia's ruling based on *Anderson* is understandable based on the Fourth Circuit's recent decision in *Burket* that it was "uncertain of the true scope of the *Anderson* rule and, consequently, whether it can be properly considered an adequate and independent state procedural rule." *Burket*, 208 F.3d at 184 (*quoting Royal v. Taylor*, 188 F.3d 239 (4th Cir.1999) (questioning scope of "*Anderson*" rule), *cert. denied*, —— U.S. ——, 120 S.Ct. 465, 145 L.Ed.2d 379 (1999)). Following the Fourth Circuit's lead in *Burket* and its decision not to rely on *Anderson*, the Magistrate Judge properly declined to rule regarding the claims raised in the petition and the correctness of the Supreme Court of Virginia's ruling under *Anderson*.

*Burket,* 208 F.3d at 184. Although Beck was unsatisfied with the same conclusion by the Magistrate Judge, this Court also declines to rule as to what effect the Supreme Court of Virginia's decision in *Anderson* has on the claims before the Court. Rather, like the Magistrate Judge did, where there is any question as to the applicability of the procedural bar in *Anderson,* this Court will bypass *Anderson* and consider the merits of each of the Beck's claims.

#### C. *Actual Innocence as an Exception to Procedural Default*

Beck contends that because he claims "actual innocence" to the capital murder charges, he should be excused for any procedural default. Beck admits that he murdered the three victims, but claims actual innocence to "capital murder," maintaining that the facts found by the Supreme Court of Virginia in his case simply do not support his convictions for capital murder. For the reasons set forth fully below, the Court cannot agree with Beck on his claim of actual innocence. The facts established in this case were sufficient to support the charges of capital murder, and the Magistrate Judge was correct in his assessment that the "actual innocence" doctrine is not applicable as a defense to the procedural bar in this case.

#### D. *The AEDPA Standard of Review*

With regard to the Magistrate Judge's conclusions regarding the standard of review pursuant to the Anti-terrorism and Effective Death Penalty Act (AEDPA), Beck asserts that the federal district court is not required to "defer to the state court's denial of a petitioner's claims when such state court denial was the result of an adjudication on the merits." [3] Beck relies on the United States Supreme Court's recent decision in *Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and its recitation of the standard of review of a Section 2254 petition. Beck contends that *Williams* stands for the proposition that a federal court reviewing a habeas petition has an "independent obligation to say what the law is." *Id.* at 1521–22; *see also Barnabei v. Angelone,* 214 F.3d 463, 469–70 (4th Cir.2000) (following the standard set forth in *Williams*), *cert. denied,* —— U.S. ——, 121 S.Ct. 24, —— L.Ed.2d —— (2000); *Cardwell v. Greene,* 152 F.3d 331, 339 (4th Cir.1998), *cert. denied,* 525 U.S. 1037, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998) (requiring a de novo review when the Supreme Court of a state denies a habeas petition in a summary order without specifically stating its reasons for dismissal).

In this case, the Magistrate Judge properly reviewed Beck's claims to determine whether they were either exhausted or procedurally defaulted, or both, and if appropriate, he conducted an independent review of both the factual and legal bases of Beck's claims recognizing constraints on judicial review as set forth in Section 2254. *See Barnabei,* 214 F.3d at 469. The Magistrate Judge's recommendations were

---

**3.** The AEDPA supplies the standard for determining whether a writ of habeas corpus should be granted and, therefore, whether the R & R should be rejected, modified, or recommitted with instructions. The AEDPA is applicable in this case because the federal petition was filed after April 24, 1996, the enactment date of the AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA standard is set forth in newly amended 28 U.S.C. § 2254(d), which provides as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursu-

ant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

wholly consistent with the standards set forth in *Williams. Williams,* 120 S.Ct. at 1521.

### E. Standard of Review Applicable to Ineffective Assistance of Counsel Claims

Similar to his challenge to the standard of review pursuant to the AEDPA, with regard to the standard of review applicable to Beck's claims of ineffective assistance of counsel, Beck objects to the Magistrate Judge's reference to the "deference" owed to the state courts. Beck argues that the Court owes no deference pursuant to *Williams.* For the reasons set forth above, Beck's challenge to the semantics of the Magistrate Judge's R & R regarding the applicable deference to the state court decision, if any, does not justify overturning any portion of the R & R. Regardless of the Magistrate Judge's choice of words in his R & R and his use of the word "deference," his review of Beck's habeas petition struck the appropriate balance described in *Barnabei*—"recognizing the legal effect of the prior state adjudication while independently reviewing the issues raised." *Barnabei,* 214 F.3d at 469 (quoting *Cardwell,* 152 F.3d at 339).

In a similar attack on semantics, Beck objects to the Magistrate Judge's use of the word "incompetent" in describing the performance prong of evaluating a petitioner's claim of ineffective assistance of counsel under the well-established two-part test of *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The standard of *Strickland* was correctly applied by the Magistrate Judge and is as follows: First, the court must determine whether the counsel's performance was deficient based on the "objective standard of reasonableness" test. *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. Second, the petitioner must demonstrate prejudice as a result of the counsel's alleged ineffective assistance. *Id.; see also Wright v. Angelone,* 151 F.3d at 161 (noting a strong presumption that counsel's performance was within the wide range of professional competence). To show prejudice, the petitioner must show "by a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The use of the word "incompetence" in the R & R did not change review employed by the Magistrate Judge, and therefore, the R & R will not be disturbed on this basis.

### III. Beck's Claims and the Findings of Facts and Conclusions of Law in the R & R

### A. Claim A—Sufficiency of the Evidence

In Claim A of the petition, Beck asserts that he was denied his Fourteenth Amendment due process rights because the Commonwealth failed to prove each element of the charged crimes beyond a reasonable doubt. Specifically, Beck argues that the Commonwealth failed to prove the elements of rape or robbery, and therefore, that he cannot be found guilty of capital murder. The Magistrate Judge found that Claim A was reviewed in the state proceedings as one of "sufficiency of the evidence," and therefore, that Beck had exhausted this claim, and for obvious reasons, Beck does not object to this finding. However, as set forth below, Beck objects to the remainder of the conclusions made by the Magistrate Judge regarding Claim A.

#### 1. Procedural Bar

The Magistrate Judge found that the Supreme Court of Virginia had ruled that the claim of insufficient evidence was procedurally barred pursuant to *Slayton v. Parrigan,* and therefore, that to proceed with Claim A in this Court, Beck would be required to show cause and prejudice or actual innocence before the Court could consider Claim A (sufficiency of the evidence) on the merits.

Beck argued as to cause and prejudice that his counsel performed ineffectively because they were simply ignorant of the applicable law. Like this Court, the Magistrate Judge rejected Beck's arguments finding that he did not qualify under either the cause or the prejudice exceptions to the procedural bar.

Beck additionally argues his "actual innocence" of rape and robbery, and that his actual innocence operates as an exception to the procedural bar. To qualify under the actual innocence exception, a petitioner must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law." *Sawyer v. Whitley,* 505 U.S. 333, 348, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *Hoke v. Netherland,* 92 F.3d 1350, 1358 (4th Cir.1996) (citing *Sawyer*) (reversing district court's finding on habeas petition that petitioner was "actually innocent"), *cert. denied,* 519 U.S. 1048, 117 S.Ct. 630, 136 L.Ed.2d 548 (1996).

The Magistrate Judge characterized the "thrust" of Beck's argument in this regard as his contention that a person cannot rape or rob a dead person. In his objections to the R & R, Beck specifically objects to the Magistrate Judge's characterization of his argument, asserting that the R & R oversimplifies his position. Beck contends that besides the "thrust" of his argument described by the Magistrate Judge, his claim encompasses an interpretation of Virginia law as requiring in a capital murder case (based on robbery or rape as the underlying offense) that there be a "nexus" between the two crimes. Beck asserts that based on the facts found by the Supreme Court of Virginia in reviewing his claim, there is an insufficient nexus to find him guilty of capital murder.[4]

Beck contends that as set forth in his affidavit submitted in state court there are facts putting at issue the "nexus" between

the charged crimes of rape, robbery and murder. Specifically, Beck maintains that he first killed Florence Marks, and then, in an effort to cover-up the murder of Marks, he tore her clothes from her lower body and penetrated her with the end of a hammer. It is true that, based on the evidence before the Court, Beck has steadfastly denied that he actually had "sexual contact" with Marks or physically penetrated her with any of his body parts. However, as was stated on the record by the prosecutor during the plea colloquy and is accepted as a fact by this Court, a used condom was found in the victims' house with DNA evidence consistent with that of both Marks and Beck. *See* Transcript of Guilty Plea at 25 (May 1996) (statement of facts by the prosecutor). Furthermore, as the Commonwealth stated at the guilty plea, and Beck and his counsel admitted would be the facts if the matter had proceeded to trial, "[t]he medical examiner, pursuant to an investigation, discovered vaginal redness which was not consistent with inanimate object penetration, but appeared to be consistent with sexual intercourse with a condom." *See* Plea Transcript at 20. Based on all of the evidence before it, the trial court found at sentencing that Beck raped Marks. *See* Sentencing Transcript Vol. IV at 837.

The facts, as first described by Beck in the tape-recorded statements he made to the police, describe the sequence of events leading to the robberies of the three victims and the rape of Marks. As the Magistrate Judge correctly noted, the law in Virginia simply does not support Beck's argument with regard to the sequence of events of the murder and rape of Marks. Section 18.2–31(e) of the Virginia Code provides that "the willful, deliberate and premeditated killing of any person in commission of, or subsequent to, rape" constitutes capital murder. Va.Code. Ann.

---

4. In making this argument as to actual innocence, Beck refers the Court to his legal analysis of Claim 2 (the involuntariness of the plea) and argues that for the same reasons Claim A should be granted.

§ 18.2–31(e); *see Spencer v. Commonwealth,* 238 Va. 275, 283, 384 S.E.2d 775, 779 (1989) (citations omitted)(defining rape as "sexual intercourse with a female by force and against her will"), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990). The Supreme Court of Virginia has repeatedly held that a rape can occur after a victim is dead. *See Spencer,* 238 Va. at 285–86, 384 S.E.2d 775 (finding that rape could have occurred after the victim died) (citing *Coleman v. Commonwealth,* 226 Va. 31, 51, 307 S.E.2d 864 (1983) (upholding jury instruction that provided "when the death of the victim occurs in connection with rape, it shall be immaterial in the prosecution thereof whether the alleged rape occurred before or after the death of the victim")). Additionally, the sequence of events are sufficient in this case to establish that the rape of Marks and the murder of Marks are interconnected as part of the same criminal enterprise.[5] *See Savino v. Murray,* 82 F.3d 593, 601 (4th Cir.)(quoting *George v. Commonwealth,* 242 Va. 264, 411 S.E.2d 12, 20 (1991), *cert. denied,* 503 U.S. 973, 112 S.Ct. 1591, 118 L.Ed.2d 308 (1992)), *cert. denied,* 518 U.S. 1036, 117 S.Ct. 1, 135 L.Ed.2d 1098 (1996).

With regard to the capital murders of each of the three victims predicated on the underlying charge of robbery, Beck contends that he robbed the dead victims to cover-up their murders, and that the robberies were separate and distinct from the murders—not meeting the elements of "capital murder." In *Savino v. Murray,* the Fourth Circuit clearly held that

> Under Virginia law, murder in the commission of a robbery is a "killing which takes place before, during or after the robbery and is so closely related thereto in time, place and causal connection as

to make the killing part of the same criminal enterprise."

*Savino v. Murray,* 82 F.3d at 601; *see also Hoke v. Netherland,* 92 F.3d at 1363 (finding that robbery for the purposes of serving as the predicate for a capital murder conviction can occur after the death of the victim) (citing *Savino,* 82 F.3d at 601). The *Savino* court stated that "the fact that stealing occurs after the killing does not prove that the decision to steal was an afterthought and [that] the two crimes were unrelated." *Id.* (finding that the facts met the standard for "murder in the commission of a robbery" within the meaning of Code of Virginia section 18.2–31). In this case, as in *Savino,* a reasonable juror could have easily found that Beck committed robbery in connection with the murders of Marks, Miller and Kaplan. Beck does not dispute that he took property from the victims with the intention of stealing it from their presence. *Wise v. Commonwealth,* 230 Va. 322, 334, 337 S.E.2d 715 (1985), *cert. denied,* 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986). Aside from their money, Beck took a bicycle from Miller, a gun from Miller, and Miller's car. Beck arrived in Virginia with no car, killed Miller and returned to Pennsylvania in Miller's stolen car. Presumably he additionally spent the small amount of money he took from each of the victims' wallets. A reasonable jury could have easily found that Beck's robbery of each of the victims was interrelated with the murders. *Savino,* 82 F.3d at 601.

Beck does not deny that he murdered the victims, or that he robbed them after murdering them. He merely contends that he is innocent of capital murder due to the lack of interconnectedness between his crimes of murder and the robbery of the victims, or between the murder of

---

**5.** Furthermore, the Court notes the forensic evidence, proffered by the Commonwealth at the guilty plea as what it would have presented at trial, regarding Marks' physical condition and the DNA evidence on the used condom found near Marks' body. This evidence, along with the statements made by Beck to the police were all before the trial court. Beck's claims as to his conduct with Marks is directly contradicted by the evidence the Commonwealth explained it would have presented regarding the charged rape.

Marks and her rape. Based on the case law cited above, the clear definitions of the statutory crimes of robbery and rape, the undisputed evidence stipulated to during the plea colloquy, and accepting the fact that two of the pleas were *"Alford* pleas," the Court finds that the Magistrate Judge was correct in his conclusion that the "actual innocence" doctrine does not apply as an exception to the procedural bar applicable to these claims.

As the Fourth Circuit found in *Hoke,* in this case Beck has failed to show by clear and convincing evidence that he is actually innocent of the capital murder charges. Based on the facts of this case, it cannot be said that, but for Beck's counsels' recommendations and Beck's decision to plead guilty, no reasonable juror could have found Beck guilty as charged and eligible for the death penalty. *Hoke,* 92 F.3d at 1363 (citing *Sawyer,* 505 U.S. at 348, 112 S.Ct. 2514). As a result of this Court's findings and conclusions, and an examination of the full record in this case, the Court agrees with the legal conclusions of the Magistrate Judge that Beck's Claim A should be DISMISSED as a matter of law based on the procedural bar of *Slayton v. Parrigan,* and that the exception of "actual innocence" does not apply in this case.[6] *See Mu'min v. Pruett,* 125 F.3d 192, 194 (4th Cir.1997) (applying procedural bar from *Slayton v. Parrigan* ), *cert. denied,* 522 U.S. 978, 118 S.Ct. 438, 139 L.Ed.2d 337 (1997).

2. *Whether the Plea was Counseled and Voluntary*

Because the Court finds that the procedural bar applies, it need go no further. However, as the Magistrate Judge did, this Court will briefly address the merits of Beck's Claim A so as to leave no doubt that the claim should be dismissed in its entirety. As set forth above, Beck asserts in Claim A that the evidence submitted to the trial court was insufficient to convict him of capital murder, and that his conviction was the result of ineffective assistance of counsel regarding the decision to enter a plea.

 As the Magistrate Judge noted, a voluntary and intelligent plea of guilty "is an admission of all the elements of a formal criminal charge." *United States v. Willis,* 992 F.2d 489, 490 (4th Cir.1993) (quoting *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969)), *cert. denied,* 510 U.S. 857, 114 S.Ct. 167, 126 L.Ed.2d 127 (1993). When a guilty plea is subsequently challenged, the inquiry is normally whether the plea was "counseled and voluntary." *United States v. Willis,* 992 F.2d at 490.

The Magistrate Judge reviewed the *Alford* pleas entered by Beck and found that the evidence was sufficiently strong for the circuit court judge to accept the guilty pleas and enter findings of guilt. Because the primary issue before the Court is whether Beck was properly advised regarding the decision to plead guilty to rape and use of a firearm during the commission of the rape of Ms. Marks, the Court will consider the colloquy regarding each of the "Alford pleas."

 On the record at the hearing on Beck's guilty plea, Beck was questioned specifically by the judge regarding his decision to enter an *Alford* plea to the charge of the rape of Ms. Marks. *See* Transcript of Guilty Plea at 10. The trial court specifically advised Beck that although he did not admit specifically committing the crimes charged in CR–96–132 and CR–96–133 (the rape and use of a firearm during the commission of a rape charges), the

---

**6.** Additionally, the Court notes that Beck has admitted that he murdered three victims, and that as a result of this admission, which he has not denied, he initially plead guilty to the multiple homicide charge of capital murder. *See Savino,* 82 F.3d at 601 (speculating regarding other ways capital murder could have proven). As set forth above, Beck's plea to the multiple homicide count was ultimately withdrawn and the charge nolle prossed. *See Clagett,* 252 Va. at 95-6, 472 S.E.2d 263.

trial court could and would find him guilty if it believed, based on the evidence produced by the Commonwealth, that the Commonwealth could have proved he was guilty. *Id.* To these statements made by the trial court, Beck responded "yes, I understand;" *i.e.,* that he understood the implications of the *Alford* plea. *Id.* Beck further answered in the affirmative that he had made the decision to plead guilty after discussions with his attorneys and determining that it was in his best interest to enter a plea of guilty. *Id.* The court continued to question Beck specifically referring to the charges "in Paragraph 5A," *i.e.,* the rape and use of a firearm during a rape charges. *See* Transcript of Guilty Plea at 10 (May 15, 1996). The court confirmed that Beck understood that although he did not specifically admit guilt to these charges, the court could and would find him guilty if it believed that he was guilty based on the evidence that the Commonwealth would have produced. *Id.* at 10. After confirming that Beck fully understood the charges, the potential penalties if he was found guilty, and the rights he would waive if he was allowed to plead guilty, the Commonwealth clearly outlined the evidence it believed it would prove beyond a reasonable doubt if the matter proceeded to trial. *Id.* at 16–25. In addition to the statements made by the Commonwealth at the plea, the tape recorded statements of Beck were introduced. At the end of the prosecutor's statements, the court questioned Beck's counsel and they both answered in the affirmative that the facts as described by the Commonwealth's attorney would have been the Commonwealth's evidence at trial. *Id.* at 26. Both trial counsel and Beck additionally responded affirmatively when asked whether the facts as described by the Commonwealth's attorney would have "made a prima facie case against [Mr. Beck] as to each of [the] charges." *Id.* at 26. Following Beck's and his counsels' confirmation of

the facts and their belief that the Commonwealth could prove its case, the court found, pursuant to the guilty pleas and the *Alford* pleas, that Beck was guilty as charged; including the charge of multiple murders, which was later nolle prossed. *Id.*

Based on all of the above and the Court's complete review of the Plea Memorandum and the colloquy of the guilty pleas, the Court FINDS that Beck's pleas all were counseled, knowing and voluntary. As a result, the Court AFFIRMS the Magistrate Judge's recommendation and Claim A is hereby DISMISSED.

▆▆▆ Additionally as to Claim A, on May 30, 2000, Beck renewed his request for an evidentiary hearing to determine whether his plea was voluntary. In March 2000, the Court considered and denied Beck's request for an evidentiary hearing.[7] As set forth above, since this Court's March Order, both the Magistrate Judge in his R & R and this Court have concluded that the claim of the knowing and voluntary nature of the plea is procedurally barred by *Slayton.* Additionally, for the reasons stated above, the Court finds that Claim A lacks merit. As the Fourth Circuit found in *Cardwell,* a federal habeas petitioner is entitled to an evidentiary hearing if he is able to allege "additional facts that, if true, would entitle him to relief." *Cardwell,* 152 F.3d at 339. As the above discussion indicates, however, Beck has not alleged facts in Claim A, that, if true, would warrant relief. *See Goins v. Angelone,* 226 F.3d 312 (4th Cir.2000) (denying request for evidentiary hearing under similar circumstances). Therefore, his renewed request for an evidentiary hearing as to Claim A is DENIED.

B. *Claim B—Validity of Beck's Guilty Pleas*

In Claim B of his federal habeas petition, Beck contends that the trial court did

---

7. Specifically, the Court declined to rule on the issue until it determined whether the procedural bar applied to the claim, as suggested

by the Magistrate Judge in its December 2000 Order.

not adequately inquire as to Beck's understanding of the charges pending against him, and that his counsel were ineffective regarding their advice to him as to whether to plead guilty and his understanding of the pending charges.

### 1. Trial Court's Inquiry

#### a. Exhaustion and Procedural Bar

The Supreme Court of Virginia determined that Beck's claim regarding trial court error and the trial court's inquiry was procedurally barred pursuant to *Slayton*. Based on the procedural bar of *Slayton*, the Magistrate Judge considered in his R & R whether Beck had shown "cause and prejudice" or "actual innocence" before considering the merits of Claim B. The Magistrate Judge found that Beck had failed to overcome the procedural bar and that he did not show either cause and prejudice or actual innocence. Similarly, for the same reasons this Court rejected Beck's claims of cause and prejudice or actual innocence for Claim A, so are his excuses rejected as to Claim B. Furthermore, the Court disagrees with Beck's assertion that the Supreme Court of Virginia's most recent ruling on his second (successive) petition in state court corrects any procedural bar. For this reason, Claim B must be denied and dismissed.

#### b. Review of the Merits

■ However, as the Magistrate Judge did, this Court will likewise review the merits of Claim B to determine whether if the procedural bar did not apply Beck's claim would have any merit. The Supreme Court's decision in *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), provides the standard for a trial court's inquiry into the voluntariness and intelligence of a defendant attempting to plead guilty. To determine the voluntary nature of a plea of guilt, the court should review the record to ensure that the trial court properly reviewed the matter with the accused. *See Wade v.*

*Coiner*, 468 F.2d 1059 (4th Cir.1972). In reviewing the voluntary and intelligent nature of Beck's plea, the Magistrate Judge reviewed the transcript of the plea on almost a statement-by-statement basis of the colloquy and noted that Beck personally acknowledged at least 28 separate items brought to his attention by the trial court, including the maximum punishments, his waiver of rights, and finally, that he did not have any questions for the court. *See* Plea Transcript (May 15, 1996). As the Magistrate Judge noted, the plea colloquy followed by the trial judge complied with the Supreme Court of Virginia's suggested form of inquiry. *See* Rules of the S.Ct. Va., Form 6.

This Court has likewise reviewed the transcript of Beck's guilty plea, and cannot agree with Beck's suggestion that the colloquy was "rambling" in any respect or that it lacked any questions required by law. Rather, based on this Court's review of the plea colloquy between the trial court and Beck, the Court is convinced that Beck's plea was intelligent, knowing and voluntary. *See Blackledge v. Allison*, 431 U.S. 63, 73–74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

In his objections, Beck argues that the Magistrate Judge failed to consider the requirement set forth in *Boykin* that all matters in the colloquy upon which a reviewing court may rely "must be matters of *record*." *See* Objections at 14 (emphasis in original). Beck assigns fault to the trial court for allegedly failing to determine that the signatures on the plea memorandum were in fact those of the defendant, Beck, and his counsel. Similarly, Beck contends that the trial court did not ensure that the document it was referring to was the same document that Beck had reviewed with trial counsel. Finally, Beck claims that the plea memorandum was never made part of the record in trial court.

■ None of these arguments have merit. While Beck raises these attempted

red flags, he stops short of claiming that the documents are faulty or unauthentic, or that the signatures are false. There is no dispute that Beck signed the plea memorandum, and that his counsel and the Commonwealth attorneys signed the memorandum. In fact, as the Commonwealth points out in its responsive memorandum, the plea memorandum was presented to the trial court by the defense counsel. Furthermore, while the memorandum may not have been made an exhibit by any party or the court, it was placed in the trial court record, and remains part of the record of the proceedings in trial court. Therefore, the validity of the actual document (the plea memorandum) is a non-issue so far as this Court is concerned.

Beck challenges the trial court's questions as to whether Beck believed he was guilty based on what he argues are conclusory statements overcome by the fact that he now claims his counsel were ineffective in explaining the elements of the offenses to him. Beck argues that his answers merely establish that he trusted his lawyers, whom he now claims were ineffective. Similarly, Beck challenges the fact that the trial court never formally read the indictment to him, and therefore, he never clearly understood the elements of the offenses for which he was charged, except that he knew the possibility of the death penalty as a punishment.[8]

Beck additionally challenges two of the statements made by the trial court, and relied on by the Magistrate Judge, as "bad law." That is, in the statements numbered 17 and 20 by the Magistrate Judge, the trial court advised Beck that he was waiving his right to appeal "the decision of the court" and "the decision of the court for the charges upon which he is entering Alford pleas." See R & R at 30. Beck argues that the trial court improperly advised him because according to Beck, a

capital defendant cannot waive his or her right to appeal. Although Beck did ultimately appeal his apparent waiver, Beck claims that the trial court's admonition of an incorrect statement of the law demonstrates that the trial court was unaware of aspects of Virginia's law as to death penalty cases, and generally calls into question the trial court's ability to determine whether Beck's plea was voluntary and intelligent. See Objections at 30.

Like the issue addressed above regarding the authenticity of the plea memorandum, this argument is a non-issue. Beck's waiver of appeal was with regard to his admission of guilt, and not to a sentence imposed. His waiver was permissible and was acknowledged by the Supreme Court of Virginia when it confirmed Beck's conviction on direct appeal. The Court finds no error in the Magistrate Judge's assessment of the record of the guilty plea, or in the proceedings below. The Court is in complete conformity with the Magistrate Judge in his R & R regarding the applicable law, and agrees that Beck's Claim B(1) in his federal habeas petition (regarding the adequacy of the trial court's acceptance of the plea of guilty) should be DISMISSED based on the procedural bar, and furthermore, based on a review of the merits of the claim.

### 2. Trial Counsel's Effectiveness

Also in Claim B, Beck contends in Claim B(2) that his counsel were ineffective, that they failed to adequately explain the elements of the charged crimes, and that they unreasonably stipulated to the admission of guilt.

### a. Exhaustion and Procedural Bar

As noted in the R & R, the Supreme Court of Virginia applied the procedural

---

**8.** Beck seeks an evidentiary hearing on this issue to determine whether his counsel correctly explained the elements of the offense to him. See Objections at 16 (citing March 29, 2000 Order at n. 8). For the reasons set forth below, the Court finds that an evidentiary hearing is unnecessary. The Court additionally notes that Beck originally plead guilty to the multiple homicide capital murder count.

bar of *Slayton* to Beck's claims of ineffective assistance of counsel. However, rather than stopping his inquiry with *Slayton,* due to the questionable nature of barring claims of ineffective assistance of counsel by use of *Slayton,* the Magistrate Judge went one step further and again reviewed the merits of the claim. Of course, Beck disagrees that the claim is procedurally barred, but does not object to the Magistrate Judge's decision to render a decision on the merits. As a result, it is unnecessary for this Court to review the applicability of the *Slayton* procedural bar in this case, and it can instead proceed directly to the merits.

### b. *Review of the Merits*

The Magistrate Judge correctly described the "thrust" of Beck's Claim B(2) as Beck's counsels' misunderstanding of the elements of the crimes for which Beck was charged and therefore, his ultimate decision to plead guilty. As set forth above, Beck does not deny that he killed the victims named in the indictment, or that after they were dead he robbed the victims. Beck technically denies that he actually "raped" Marks; however, he does not deny what he has steadfastly admitted as to his conduct towards Marks (that he violated her with a hammer after she was dead), nor does he deny that the prosecutor claimed to have a used condom which indicated that sexual conduct had occurred between Marks and Beck. Rather than challenging the facts, Beck argues as a matter of law that a sufficient nexus does not exist to connect the rape and robberies with the murders to establish the elements of "capital murder." This precise issue was discussed in detail above and need not be reiterated. As set forth above, it is this Court's opinion that Beck is simply incorrect in his understanding of the applicable law in Virginia.

That issue aside, in challenging the R & R, Beck focuses his objections not on his "actual innocence," but on whether his counsel properly advised him regarding the elements of the charged offenses in a way that Beck could make an intelligent decision regarding whether to plead guilty. Beck correctly cites *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), for the proposition that the issue before the Court turns on whether counsel's advice was such that except for their errors, Beck would not have plead guilty. In *Hill,* the Supreme Court held that the test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among alternative courses of action open to the defendant." *Hill,* 474 U.S. at 56, 106 S.Ct. 366; *Matthew v. Johnson,* 201 F.3d 353, 364 (5th Cir.2000) (quoting *Hill* ) (finding that to assess the validity of a challenged guilty plea, the court should consider all the circumstances surrounding the plea). For example, the defendant must be competent. *Id.* (citing *Brady v. United States,* 397 U.S. 742, 756, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). Additionally, the defendant must have notice of the charges pending against him. *Matthew,* 201 F.3d at 365 (citing *Henderson v. Morgan,* 426 U.S. 637, 645 n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976)). The plea must be voluntary, *i.e.,* not the consequence of threats or mental coercion. *Matthew,* 201 F.3d at 365 (citations omitted). The defendant must understand the consequences of the plea, including the nature of the constitutional protections he is waiving. *Id.* (citations omitted). Finally, the defendant must have available the advice of competent counsel to ensure that the plea is voluntarily and intelligently made. *Id.* (citing *Tollett,* 411 U.S. 258, 267–68, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)) (other citations omitted).

In Claim B(2), as well as in other related claims addressed herein, Beck challenges the validity of his plea arguing that he lacked competent counsel to ensure that his plea was voluntary and intelligent. In particular, Beck argues that his plea was not intelligently made because he did not fully understand the claims. The ap-

plicable test for judging the assistance of counsel on a guilty plea is set forth in *Hill* and is slightly different from the standard set forth above under *Strickland v. Washington.* The primary difference is under the prejudice prong of the analysis. As set forth above, under *Strickland,* the defendant establishes prejudice if, but for counsel's performance, there is a reasonable probability that the result of the proceedings would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Under *Hill,* the defendant must show that there is a reasonable probability that he would not have pled guilty, and instead would have insisted on going to trial. *See Burket,* 208 F.3d at 189 (citing *Hill*).

Beck argues that there are conflicting affidavits (his and his counsels) regarding whether his counsel understood the elements of the offenses charged, and that the conflict between the affidavits remains unresolved. Beck argues that with two factually competing and mutually exclusive affidavits on the issue of what he understood or was told, the only method to resolve the issue is by conducting an evidentiary hearing. As set forth above, this Court denied Beck's first motion for an evidentiary hearing. *See* Order (March 2000) (citing *Cardwell v. Greene,* 152 F.3d at 336). Beck relies on this Court's March 29, 2000 Opinion, n. 8, as the basis for his request for a hearing on this issue. Beck contends that his counsels' affidavit is worth no more credence than his own affidavit, and objects to the Magistrate Judge referencing the attorneys' affidavits and not his own affidavit. *See United States v. Crawford,* 161 F.3d 4, 1998 WL 610870 (4th Cir.1998) (unpublished) (finding that an evidentiary hearing was required). Beck contends that without an evidentiary

hearing, it is impossible to determine whether his counsel understood the elements of the offense, as the Magistrate Judge determined that they did.

The Magistrate Judge relied on *Spencer v. Commonwealth,* 238 Va. 275, 384 S.E.2d 775 (1989), and *Coleman v. Commonwealth,* 226 Va. 31, 307 S.E.2d 864 (1983), as supporting the conclusion that a defendant commits capital murder even when the rape of the victim occurs subsequent to the murder. Beck argues that the facts of cases such as *Spencer* and *Coleman* are distinguishable from the facts in this case. Specifically, Beck argues that the rape was secondary and not intended when he first killed Ms. Marks. Beck contends that the Magistrate Judge lost sight of the reason for which Beck has steadfastly claimed that he originally entered the victims' home, *i.e.,* to kill Bill Miller. *See* Statement of Beck at 16 (June 8, 1995) (explaining facts he alleges as to Marks). As a result, Beck argues the facts do not support a finding of rape, but merely a "staged rape." [9]

Even accepting the facts as set forth by Beck; that he entered the home to kill one particular man, Mr. Miller, and that he ultimately killed two others, Ms. Marks and Mr. Kaplan, and that only as an afterthought in an attempt to disguise his involvement in the murders did he rob each of the victims and "stage" the rape of Marks, still the Court finds as a matter of law that such facts satisfy the elements of capital murder as it is defined in the Virginia Code and has been interpreted by the Supreme Court of Virginia. *See* Discussion *supra* regarding actual innocence. There is no doubt that the robberies, the rape of Marks and the murders of the

9. Contrary to Beck's assertion, the Supreme Court of Virginia made no finding with regard to whether Beck "staged" a rape. Rather, the Supreme Court and the Magistrate Judge both merely note that Beck made certain statements regarding his intentions when he raped Marks. *See Beck v. Commonwealth,* 253 Va. at 377, 484 S.E.2d 898. Because Beck plead guilty, no court has thus far been

required to make specific findings of fact. Importantly, however, the Supreme Court of Virginia noted that although Beck claimed that he did not actually rape Marks, the DNA evidence collected from the used condom at the scene of the crime "was in direct conflict with Beck's statements concerning the rape of Marks." *Beck,* 253 Va. at 379, 484 S.E.2d 898.

victims occurred "so closely in time, place and causal connection as to make the killing, as a matter of law, part of the same criminal enterprise" as the admitted robberies of the victims and the rape of Marks. *Briley v. Commonwealth,* 221 Va. 532, 543–44, 273 S.E.2d 48, 55–56 (1980), *cert. denied,* 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400 (1981).

The Court simply disagrees with Beck that the "nexus" is not present between the murders and the related offenses of robbery and rape. While Beck may not have entered the house with the specific intent to kill all three victims and to rob all three and rape Marks, and while the victims perhaps may not have technically died simultaneously with "the commission of a robbery or rape," they were in fact raped and robbed as part of the same criminal enterprise which surrounded the murders. Although the most commonly considered murder in the commission of a rape or robbery might be where the rape or robbery is the primary goal of the defendant, and the murder occurs incidental to and even perhaps as a result of an unexpected occurrence, the capital murder statute does not limit capital murder convictions to such facts. *See Pope v. Netherland,* 113 F.3d 1364, 1369 (4th Cir.), *cert. denied,* 521 U.S. 1140, 118 S.Ct. 16, 138 L.Ed.2d 1048 (1997), *aff'g* 234 Va. 114, 360 S.E.2d 352, 359 (1987) (finding that proof of robbery was sufficient as underlying crime supporting capital murder conviction); *Savino,* 82 F.3d at 601 ("the fact that stealing occurs after the killing does not mean that the decision to steal was an afterthought and that the two crimes were unrelated," and "a killing which takes place before, during, or after the robbery" and is so clearly related to the robbery "in time, place, and causal connection as to make the killing part of the same criminal enterprise as the robbery" satisfies § 18.2–31); *see also Wise,* 230 Va. at 329, 337 S.E.2d 715 (finding that evidence was sufficient to show that murder was committed in connection with robbery, albeit merely $6.00), *cert.*

*denied,* 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986); *Hoke v. Commonwealth,* 237 Va. 303, 377 S.E.2d 595, 600 (1989) (finding defendant killed victim in connection with a robbery while armed with a dangerous weapon); *Edmonds v. Commonwealth,* 229 Va. 303, 329 S.E.2d 807, 812 (1985)(finding that the killing and theft were so closely related in time that they were interdependent and that capital murder conviction was justified under the facts), *cert. denied,* 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985); *Correll v. Commonwealth,* 232 Va. 454, 352 S.E.2d 352, 358 (1987) (finding sufficient evidence for capital murder conviction where defendant was armed with knife during portion of robbery), *cert. denied,* 482 U.S. 931, 107 S.Ct. 3219, 96 L.Ed.2d 705 (1987); *Briley,* 221 Va. at 544, 273 S.E.2d 48 (finding that robbery of vehicle which occurred after the murder of the owner of the vehicle was part of the same criminal enterprise constituting capital murder).

Because this Court rejects Beck's argument that he is actually innocent of capital murder due to the timing of the rape and robberies (subsequent to the actual murder), the Court cannot find, as Beck suggests, that his counsel inadequately provided advice regarding the elements of rape and robbery. Nor can the Court find that Beck's counsels' assistance falls below that which is objectively reasonable. Based on the affidavits of Beck's trial counsel, it is clear that his counsel fully understood the elements of the offense of capital murder, as well as the elements of the underlying robbery, rape and use of firearm charges, and that his counsel properly explained the elements to Beck. Furthermore, as to the second prong under the *Strickland–Hill* analysis, the Court cannot find that but for counsels' advice to Beck he would have proceeded to trial.

The Supreme Court's decision in *Blackledge* provides that "solemn declarations in open court carry a strong presumption of

veracity."[10] *Blackledge,* 431 U.S. at 73–74, 97 S.Ct. 1621; *Burket,* 208 F.3d at 191 (finding that defendant "is bound by the representations made during the plea colloquy") (citations omitted); *Willis,* 992 F.2d at 490–91 (finding that admissions in plea of guilty are binding as to sufficiency of the evidence as factual basis for guilt). As set forth above, during the plea colloquy Beck acknowledged that he understood the nature of the charges pending against him, that he had gone over the elements of the charges with his attorneys, and that he understood the possibility of the death penalty as punishment. *See* Transcript of Plea (May 15, 1996). Given the Commonwealth's strong evidence against Beck as set forth on the record at the plea hearing, combined with the statements made by Beck during the plea colloquy, the affidavits of both counsel and Beck, and the circumstances in this case generally, this Court FINDS that Beck's plea was made freely, voluntarily and intelligently with the assistance of competent counsel. As a result, Beck's Claim B(2) must be rejected, and is therefore, DISMISSED.

Beck contends that an evidentiary hearing is the only means by which this issue can be finally resolved. In making his request for a hearing, Beck argues that the "competing affidavits," combined with his alleged diagnosis of bipolar disorder with increasing manic episodes (which he claims is documented in the state's medical records) compel a hearing to resolve a factual dispute. *See* discussion *infra* regarding Beck's competency to understand the proceedings. For the reasons set forth above, the Court does not agree that an evidentiary hearing is necessary in this case, and therefore, the request is DENIED.

### 3. *Trial Court's Acceptance of "Alford Pleas"*

In Claim B(3), Beck contends that the "*Alford* pleas" were constitutionally flawed and should not have been accepted. The parties disagree as to whether federal habeas claim B(3) was exhausted before the state court. The Magistrate Judge acknowledged the disagreement noting that while Beck raised a claim in state court regarding his *Alford* plea, the basis of the claim was substantially different from the federal habeas claim B(3). Ultimately, the Magistrate Judge found in the R & R that the factual predicate for the federal claim related to the *Alford* plea was so different from the predicate for the state habeas claim that Beck had not satisfied his burden of exhaustion as to federal habeas Claim B(3). Unlike the previously discussed claims, the Magistrate Judge recommended dismissal and did not separately and specifically address the merits of the claim in the alternative. Instead, the Magistrate Judge referred back to the discussion in the R & R as to the merits of Claim B(1), wherein he recommended dismissal on the merits, and in the alternative finding that the plea colloquy was adequate. Beck objects arguing that the Claim B(3) has been exhausted and is not procedurally barred.[11]

■ This Court has reviewed the substance of Claim B(3) and compared it to Beck's claims presented in the state proceedings. The Court is of the opinion that the Magistrate Judge correctly found in the R & R that Claim B(3) is barred. Additionally, as discussed above, the Court has fully reviewed the plea colloquy and FINDS that the colloquy was sufficient to determine that Beck's pleas, including but not limited to his *Alford* pleas, were made

---

**10.** Beck objects to any reliance on *Blackledge,* contending that *Blackledge* merely creates a rebuttable presumption from statements made during a guilty plea, rather than an irrefutable presumption.

**11.** The respondent argues that Beck's failure to specifically acknowledge that the Magistrate Judge rejected the claim on the merits (for the reasons set forth in Claim B2), constitutes a waiver of objection to the Magistrate Judge's ruling on the merits.

knowingly, intelligently and voluntarily. Nothing before this Court indicates that Beck's counsel were ineffective in any manner, or that their performance fell outside the range of professionally competent assistance. *See Hill v. Lockhart,* 474 U.S. at 59–60, 106 S.Ct. 366; *Burket,* 208 F.3d at 190; *Wright,* 151 F.3d at 161. The fact that Beck's counsel knew enough to properly advise Beck to seek to withdraw one plea and that they were able to reach agreement with the Commonwealth that Beck's prior plea to the multiple murder count should be dismissed (presumably pursuant to the Supreme Court of Virginia's decision in *Clagett* ), shows that his counsel understood the law and were familiar with recent rulings concerning the death penalty and related issues.[12] Based on all of the above, Beck's Claim B(3) fails and must be DISMISSED.

### C. *Claim C—Adequacy of Sentencing Evidence*

Beck's federal habeas Claim C can be segregated into two separate claims. First, Beck contends that the trial court should have received evidence regarding medications Beck was taking at the time of the proceedings. Second and similarly, Beck contends that the trial court should have received and considered Beck's psychiatric health and emotional health prior to sentencing.

#### 1. *Trial Court's Inquiry as to Medications*

The parties disagree as to whether the Claim C(1) was exhausted at the state level. Beck argued before the Magistrate Judge and continues to argue that the federal habeas Claim C(1) corresponds with his state habeas claim IV(a)(1). As set forth above federal claim C(1) relates to whether the trial court should have received additional evidence regarding

Beck's medications, if any. Conversely, Beck's state claim IV(a)(1) concerned whether Beck received effective assistance of counsel in sentencing. Beck additionally attempts to link his federal habeas Claim C(1) with his state habeas claim I(c), which had to do with trial court error during the plea colloquy, or in the alternative, with his state claims III(f)(1) and (3), which related solely to the plea.

■ The Magistrate Judge found in his R & R that, while Beck may have mentioned the issue of his medication during the state proceedings, his discussion was not in the context of trial court error, as he argues in federal habeas Claim C(1). Rather, his state argument was in the context of trial counsel's failure to inquire into the same during sentencing. Based on Beck's failure to raise the issue of trial court error related to inquiry as to medications on either direct appeal or during the state habeas proceedings, the Magistrate Judge recommended dismissal of the Claim C(1). This Court is in agreement with the recommendations contained in the R & R and finds no error. Beck failed, without excuse, to raise Claim C(1) at the proceedings below and is barred from raising these issues for the first time in this proceeding. Therefore, Claim C(1) is hereby DISMISSED.

#### 2. *Trial Counsel's Failure to Provide Information Regarding Medications to the Trial Court and State of Psychiatric Health*

Unlike Claim C(1), both parties readily agree that Claim C(2) was exhausted during the state proceedings and that it is not procedurally barred. However, Beck challenges the wisdom of the Magistrate Judge's recommendation as to the merits of Claim C(2). The basis of Claim C(2) (and the state claim IV(a)(4)) is Beck's

---

**12.** As set forth above, the withdrawal of Beck's plea as to the multiple homicide capital murder count also indicates Beck's understanding of the elements of the offenses. Notably, had Beck's counsel withdrawn the

capital murder pleas on the counts premised on underlying the rape and robberies, rather than the multiple homicide count, many of the issues in Beck's habeas petition would not be before the Court at this time.

contention that the trial court was not, and should have been, informed by trial counsel of both the fact that Beck was taking certain medications and that he was diagnosed by the state's doctor as "bipolar." The Supreme Court of Virginia found that the corollary state claim (IV(a)(4)) lacked merit, and, therefore, dismissed the claim.

Beck's counsel do not deny in their combined affidavit that they failed to explicitly inform the trial court of Beck's medications, or of his alleged "diagnosis." The issue of medication and the diagnosis must be addressed separately. Beck's counsel contend in their combined affidavit that they reasonably decided not to inform the trial court of the medications Beck was taking based on their belief that the information was not pertinent. Counsels' decision was based on their interactions with Beck, and the fact that the state's mental health doctor, Dr. Nelson, expressed absolutely no concern regarding the side effects of the medicines Beck was taking at that time. Additionally, as noted by the Magistrate Judge, at Beck's sentencing hearing Dr. Cornell, an expert for the Commonwealth, testified that it would be "speculative to say what medication is or is not doing." *See* R & R at 38–39 (citing Sentencing Transcript, August 14, 1996 at 677). Based on the statements contained in the counsels' affidavits and made by Dr. Cornell at the sentencing hearing, the Magistrate Judge found that Beck did not receive ineffective assistance of counsel, as a matter of law. Specifically, the court found that Beck's counsel did not perform "incompetently;" the first prong under *Strickland.*

■ As set forth above, to evaluate a trial counsel's performance in a challenge to effective assistance of counsel, the Court looks to the guidance and two-part test developed by the Supreme Court in *Strickland. Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. In this case, the Court must determine whether Beck's counsels' admitted failure to bring to the trial court's attention Beck's medications and possible diagnosis of bipolar disorder falls within the *Strickland* standard of objective reasonableness. While hindsight might change counsels' opinions as to what to argue in any hearing, nothing in the record before this Court convinces it that Beck's counsels' failure to inform the sentencing judge of Beck's medicated state was objectively unreasonable.

Beck strenuously criticizes trial counsel, the trial judge and the Magistrate Judge for placing any level of confidence in the Commonwealth's psychologist, Dr. Cornell, or in Dr. Nelson. Beck goes so far as to call the Magistrate Judge's reliance on the psychologist's statements as "gross speculation," and "sums up" the psychologist's opinions as useless. Beck concludes by stating that the trial counsel had no excuse for failing to investigate and failing to contact the state doctor, the treating physician. This Court disagrees with Beck's attacks of the psychologist's credibility, and with his challenges to either counsel or the court's reliance on the statements made by the psychologist at the hearing.

■ Furthermore, although not required to under *Strickland,* the Magistrate Judge took his analysis one step further and reviewed whether Beck met the second prong under *Strickland:* prejudice resulting from the alleged ineffective assistance of counsel. Based on the facts before the Court, there is no evidence that Beck suffered any prejudice. Beck argues that the prejudice resulted because had the sentencing judge been aware of his medications and mental status, the court perhaps might have made different conclusions regarding Beck's lack of remorse, which in turn might have changed the determination as to the applicability of the death penalty. However, during the sentencing hearing, more than one expert testified to Beck's lack of remorse. Beck's court-appointed expert, without testifying regarding a psychiatric diagnosis of Beck, testified that Beck lacked the emotional capacity to feel remorse or appreciate the feelings of others. Transcript of Sentenc-

ing at 550 (Aug. 15, 1996). The court also relied on a note (which was read into the sentencing record) written by Beck while he was incarcerated which stated as follows:

I feel like I did good for to kill two people. And you will get this letter when I kill myself or try to escape. And I'm sorry, but I love killing. And I'm not confused. I hate people. That I can't stand the heat or hate the human race.

Sentencing Transcript at 841 (Aug. 15, 1996).

Additionally, regardless of the basis of Beck's lack of remorse, the trial court's sentence of the death penalty was based on more than Beck's lack of remorse. As the trial court explained on the record, the court was convinced of Beck's future dangerousness by his actions while he was incarcerated (including, but not limited to, an attempt to poison a fellow-inmate), and his lack of acceptance of responsibility, in particular the rape of his dead cousin. The trial court determined based on all the facts of the case that Beck "pose[d] a serious and significant continuing threat to society" beyond a reasonable doubt. Sentencing Transcript at 850–51 (Aug. 15, 1996). Furthermore, after fully reviewing the evidence, the trial court made findings with regard to the vileness of each of the murders to which Beck plead guilty. Both the vileness of the crimes, as described in detail by the trial court, and the threat of Beck's future dangerousness, also described in detail by the trial court, influenced the trial court to impose the death penalty in this case. *Beck*, 253 Va. at 376, 484 S.E.2d 898. It is clear from the record that Beck's lack of remorse was only one of several factors the trial court considered. Among other things, the court provided details of the murders; the aggravated batteries of the victims; the vile, wanton and depraved nature of the offenses; that the depravity and methodology involved in the crimes in this case were greater than that in an ordinary murder

case; and Beck's previous history of violence and rage (including threats to kill other persons in the past and an assault on a teacher). *See* Sentencing Transcript pp. 833–852. It was only after a detailed consideration of all of these factors that the trial judge determined that the death penalty was the appropriate sentence in this case.

Beck objects to the Magistrate Judge's reliance on the statements made by the trial court at sentencing as the basis for the Magistrate Judge's finding that Beck suffered no prejudice as a result of his counsels' failure to bring these matters to the court's attention. Beck contends that because the trial court did not assign a specific weight to its consideration of "lack of remorse" verses other relevant factors it considered in imposing the death penalty, the Court reviewing this habeas petition cannot now determine what impact the basis of Beck's lack of remorse might have had on the trial court's decision to impose the death penalty. However, contrary to Beck's assertions, this Court knows of no requirement that a trial court specifically assign a percentage to each factor it considers when imposing a sentence, or specifically, the death penalty. Under Beck's argument, the trial court would be required to state that the lack of remorse influenced the court "x percent," that future dangerousness influenced the court to "y percent," and that "vileness" influenced the court "z percent," and as a result, the decision is either death or life in prison. The record in this case is sufficient, without the specific assignment of percentages to considered factors, to determine that the trial court at sentencing considered more than Beck's affect (or lack of remorse) when it determined that the death penalty was the appropriate sentence.

Contrary to Beck's assertions, the Magistrate Judge did not impermissibly "defer" to the trial court's determination. Instead regardless of any deference to the trial court, based on the record before the Court, the Court cannot find that Beck

was prejudiced by the his counsels' failure to inform the court of particular medications Beck was taking or the possibility that Beck suffered from "bipolar disorder." As Beck challenges what he considers as "speculation" from the R & R, so are his objections speculative. The fact that the term "bipolar disorder" did not arise in the sentencing hearing does not require a new sentencing hearing in this case. Therefore, under both the first and the second prong of *Strickland,* Beck's claims of ineffective assistance of counsel during the sentencing hearing fail as a matter of law.

### D. Claim D—Ineffective Assistance of Counsel

### 1. Trial Counsel's Failure to Obtain Expert Assistance Pursuant to Ake v. Oklahoma

The Magistrate Judge found and the parties agree that the issue set forth in Claim D was fully exhausted and is not procedurally barred in this proceeding. Claim D challenges Beck's trial counsels' failure to request a psychiatrist to explain the effect of Beck's medications to the court and the ramifications of taking the prescribed medications. During the state proceedings, trial counsel sought the appointment of a mental health examiner, to which the court appointed Dr. Nelson, a clinical psychologist. The trial court additionally appointed a neuropsychologist for testing purposes. Beck claims that the appointment of a psychologist, rather than a psychiatrist, or without the assistance of a psychiatrist, was insufficient and that his counsel acted ineffectively by failing to request a psychiatrist (a medical doctor). Beck contends that a psychiatrist was necessary to fully explain the effects of Beck's prescribed medications.

■■■ Beck argues that *Ake v. Oklahoma* requires the appointment of a psychiatrist in a case such as his. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Contrary to Beck's interpretation of *Ake,* however, the Fourth Circuit has held that *Ake* requires a state to ensure that a defendant has access to either a psychiatrist or a psychologist. *See Wilson v. Greene,* 155 F.3d 396, 401 (4th Cir.1998), *cert. denied,* 525 U.S. 1012, 119 S.Ct. 536, 142 L.Ed.2d 441 (1998). Dr. Nelson, the court-appointed clinical psychologist in Beck's case, satisfies the requirements of *Ake.* Beck's argument, that Dr. Nelson (a psychologist) was incompetent to testify regarding the administration and effects of prescription medications because he lacked a license which would allow him to prescribe medications, lacks merit. The Fourth Circuit recently rejected the same argument in *Swann v. Taylor,* 173 F.3d 425, 1999 WL 92435 (4th Cir. 1999) (unpublished), *cert. denied,* 526 U.S. 1097, 119 S.Ct. 1591, 143 L.Ed.2d 684 (1999). In *Swann,* the Fourth Circuit held that *Ake* did not require a psychiatrist, rather than a clinical psychologist. *Id.* at *5. In Beck's trial counsels' affidavit, they explain that they did not believe a psychiatrist was necessary to evaluate Beck, in light of Beck's behavior and the court's appointment of Dr. Nelson, a clinical psychologist. *See* Docket No. 38, Ex. B at ¶¶ 7, 18.

■■■ Beck's detailed analysis of the Virginia Code's definitions of psychiatry verses psychology, as well as the different kinds of recognized psychologists, does not persuade the Court to find in his favor. Nothing in Beck's argument seriously challenges the findings and conclusions of law contained in the Magistrate Judge's R & R. The Magistrate Judge did not, as Beck suggests, imply that a psychologist could "practice medicine." Rather, based on the precedent in this Circuit, the Magistrate Judge properly concluded that there was no requirement, even under the circumstances of this case, that a medical doctor, rather than a psychologist, evaluate Beck. Neither Beck's counsel nor the court-appointed psychologist deemed the appointment of a medical doctor necessary. Beck's counsels' failure to insist on the

appointment of a psychiatrist does not render their assistance ineffective, nor did their representation fall below the objective standard of reasonableness described in *Strickland. See Swann,* at *5. Furthermore, even if Beck had satisfied the first prong under *Strickland,* Beck suffered no prejudice as a result of the decision, and therefore, the second prong of *Strickland* is additionally unsatisfied. Beck's argument in this regard is the same as that addressed above, and the Court need not reiterate it at this juncture. *See* Discussion *supra* under Claim C2. For these reasons, Beck's federal habeas Claim D1 fails and must be DISMISSED.

Beck has additionally asked this Court for an evidentiary hearing on the issue of the appointment of a psychiatrist. Based on the record before the Court, however, the Court FINDS that an evidentiary hearing is not warranted. *See Cardwell,* 152 F.3d at 337. Therefore, the motion for an evidentiary hearing on this issue is DENIED.

### 2. *Alleged Brain Damage*

Both parties agree that Claim D2 was exhausted in state court and is not procedurally barred. Therefore, the Court can proceed directly to the merits of Claim D2. In Beck's federal habeas Claim D2, he claims that his trial counsel failed during sentencing to adequately pursue the possibility that he suffered from brain damage.

▌ As set forth above, the trial court appointed Dr. Syndor–Greenberg, a clinical psychologist who performed a neuropsychological examination of Beck. Dr. Syndor–Greenberg's findings were contained in a report provided to the court-appointed clinical psychologist, Dr. Nelson, and included his conclusion that Beck suffered from attention deficit hyperactivity disorder (ADHD) and a learning disability,

which according to Dr. Syndor–Greenberg might be attributable to a subtle brain dysfunction. At the sentencing hearing, Dr. Nelson discussed Beck's purported learning disability. *See* Sentencing Transcript at 520–524 (Aug. 14, 1996). As a result, the trial court was aware of Beck's alleged ADHD diagnosis, as well as any alleged learning disability.

The Court cannot find based on the evidence before it that Beck's trial counsel should have done more to inform the trial court of any "brain damage" allegedly suffered by Beck. The trial court was aware of Beck's diagnoses as reported by the neurological examination, and the court was fully aware of the opinions and findings of Dr. Nelson, the court-appointed psychologist. The Court finds no basis in the record for Beck's allegation that during the sentencing hearing he was becoming increasingly mentally ill. To the contrary, Beck's trial counsels' affidavit provides that Beck's behavior was consistent throughout the trial court proceedings.

Beck argues that the examination by Dr. Syndor–Greenberg indicates the possibility that Beck at some point suffered from a closed head injury, which might have lead to his aberrant behavior. *See* Objections at 35. However, nothing in the record before this Court supports Beck's allegations in this regard. Instead, at best, this diagnosis is lay pontification on his part.[13]

As the Court concluded with regard to Claims C2 and D1, Beck has failed to establish that his attorneys' conduct was objectively unreasonable, or that he was prejudiced by his counsels' failure to probe the possibility that he suffered from "brain damage." As a result, Beck's claim of ineffective assistance of counsel set forth in Claim D2 fails as a matter of law pursu-

---

**13.** As the Commonwealth respondent points out in its brief, Beck's willingness to rely on lay testimony in this regard (the fact that a closed head injury could possibly have caused Beck's actions) is difficult to square with

Beck's argument in Claim D1 that Beck should have had the benefit of a psychiatric examination, rather than psychological, to determine whether the medications adversely effected him.

ant to the two-part test set forth in *Strickland v. Washington*, and is DISMISSED.

### E. *Claim E—Beck's Alleged Incompetence to Stand Trial*

In Beck's final habeas claim, Claim E, he alleges that he was incompetent to appear in court and participate in either the proceedings on May 15, 1996 (the day he plead guilty as charged), or in the sentencing proceedings on August 14 and 15, 1996, and that he was rendered ineffective assistance of counsel when his counsel failed to bring his incompetence to the trial court's attention. Beck contends that he was entitled to a competency hearing, and that failure to provide one is a ground for habeas relief.

Whether Claim E was completely exhausted during the state proceedings is a matter in dispute. Of course, Beck claims that the issue was completely exhausted in the state proceedings (*see* State Claims I(a) and III(a)). The Magistrate Judge found that the issue raised in the state proceedings was Beck's trial counsel's failure to raise the competency issue, not whether he was actually competent. The Magistrate Judge found the issue of actual incompetence procedurally barred and unexhausted based on this distinction. In doing so, the Magistrate Judge relied specifically on a statement taken from Beck's memorandum in opposition to the respondent's motion to dismiss, wherein he stated, "An after the fact determination of the petitioner's competency at the time of trial is impossible." Beck objects to the application of the procedural bar.

The second aspect of Claim E, however, was exhausted: whether trial counsel was ineffective by failing to inform the trial court of Beck's alleged incompetence. However, the Supreme Court of Virginia found the issue procedurally defaulted. Similarly, the third aspect of Claim E, whether the trial court should have *sua sponte* raised the issue of incompetence was exhausted at the state level, and deemed procedurally defaulted. As a result, the Magistrate Judge recommended dismissal based on procedural default of both parts of the Claim E which were exhausted at the state level. This Court agrees. With regard to the merits of these two parts of the Claim E, this Court's earlier conclusions with regard to Claim B (that the pleas were knowingly and voluntarily entered), also apply to whether Beck was "competent" to stand trial or participate in the sentencing hearing. *See United States v. Truglio*, 493 F.2d 574, 578 (4th Cir.1974) (considering a motion to withdraw a plea of guilty and finding that to show incompetence to plead guilty a defendant must demonstrate that his "mental faculties were so impaired ... that he was incapable of full understanding and appreciation of the charges against him or comprehending his constitutional rights and of realizing the consequences of the plea") (quoting *United States v. Malcolm*, 432 F.2d 809, 812 (2nd Cir.1970)).

 In this case, Beck's primary argument is based on a diagnosis by a jail doctor that Beck might suffer from bipolar disorder. These facts were not before the court on either direct appeal or during the state habeas petition. Nonetheless, even assuming that the diagnosis of bipolar disorder was correct, still Beck has not satisfied his burden. To show incompetence, the petitioner must demonstrate that he lacked the ability to understand the charges pending against him or to assist counsel as a result of some illness. *Burket*, 208 F.3d at 192. Beck has clearly not met this burden under *Burket*. *Id*. Based on the Court's previous discussion of the adequacy of the inquiry conducted by the trial court in the plea colloquy, the Court finds that Beck has failed to demonstrate that he was incompetent to plead guilty or participate in either the guilty plea, or the sentencing phase of the proceedings against him in state court. As a result, Claim E is procedurally barred, and in the alternative, it fails as a matter of law for the reasons set forth herein. Therefore, Claim E is DISMISSED.

On May 30, 2000, Beck filed a second motion to expand the record asking that the record be expanded to include an affi-

davit concerning his alleged diagnosis of "bipolar disorder." Beck admits that the affidavit was not presented in the state court. For the same reasons the Court denied the motion to expand the record on the Beck's first motion, this motion is also denied. *See* Order (March 30, 2000). Similarly, on May 30, 2000, Beck filed a request for an evidentiary hearing concerning his competency at the time of sentencing. The basis for Beck's request for a hearing on this claim is his allegation that the state withheld information from him regarding the alleged diagnosis of "bipolar disorder." Nothing before the Court supports Beck's contention in this regard, however. This Court has fully considered the law as set forth by the Supreme Court in *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), regarding the necessity of an evidentiary hearing in some habeas cases, as well as how *Williams* pertains to the facts in this case. Beck's request for a hearing regarding his competency at the time of sentencing based on the alleged diagnosis of bipolar diagnosis, does not fall within the exception established by *Williams*. As a result, Beck's motion for a hearing on Claim E is DENIED.

### CONCLUSION

The Court, having examined the objections to the Magistrate Judge's R & R and having reviewed the record and made *de novo* findings with respect to the portions objected to, hereby ORDERS that the petition be DENIED and DISMISSED in its entirety. Additionally, for the reasons set forth herein, each of Beck's motions for evidentiary hearings and his motion to expand the record is DENIED. Finally, the Court FINDS that oral argument is unnecessary in this matter, and therefore, Beck's motion for the same is also DENIED.

It is so ORDERED.