Filed: August 17, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

—————————————

No. 00-13
(CA-99-855-2)

—————————————

Christopher James Beck,

                              Petitioner - Appellant,

        versus

Ronald Angelone, etc.,

                              Respondent - Appellee.

—————————————

O R D E R

—————————————

        The court amends its opinion filed July 23, 2001, as follows:

        On page 22, continuation of footnote 13, line 13 -- "May 15, 1996" is corrected to read "August 15, 1996."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                                      Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

CHRISTOPHER JAMES BECK,
Petitioner-Appellant,

v.

RONALD ANGELONE, Director of the
Virginia Department of Corrections,
Respondent-Appellee.

No. 00-13

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Jerome B. Friedman, District Judge.
(CA-99-855-2)

Argued: May 8, 2001

Decided: July 23, 2001

Before WIDENER and MOTZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Dismissed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Judge Widener and Judge Motz joined.

_____

COUNSEL

**ARGUED:** Douglas Fredericks, Norfolk, Virginia, for Appellant.
Robert Quentin Harris, Assistant Attorney General, OFFICE OF THE
ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON
BRIEF:** Robert Edward Lee, Jr., VIRGINIA CAPITAL REPRESEN-
TATION RESOURCE CENTER, Charlottesville, Virginia, for

Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

## OPINION

HAMILTON, Senior Circuit Judge:

On May 15, 1996, in the Circuit Court for Arlington County, Virginia, Christopher James Beck (Beck) pled guilty to four counts of capital murder, Va. Code Ann. § 18.2-31, one count of rape, id. § 18.2-61, three counts of robbery, id. § 18.2-58, one count of burglary, id. § 18.2-90, and seven offenses involving the use of a firearm, id. § 18.2-53.1.[1] Following a sentencing hearing in which the state trial court sat as trier of fact, the state trial court sentenced Beck to death on the capital murder counts. After exhausting his state remedies, Beck filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Virginia, 28 U.S.C. § 2254,[2] which the district court dismissed.[3] Beck seeks a certificate of appealability granting permission to appeal the district court's order dismissing his petition for writ of habeas corpus. Because Beck has failed to make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2), we deny his application for a certificate of appealability and dismiss the appeal.

_____

[1] One count of capital murder subsequently was nolle prossed, and Beck was permitted to withdraw his plea of guilty on that count.

[2] Beck named Ronald Angelone, Director of the Virginia Department of Corrections, as respondent. For ease of reference, we will refer to respondent as "the Commonwealth" throughout this opinion.

[3] Because Beck's petition for writ of habeas corpus was filed after the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, the amendments to 28 U.S.C. § 2254 effected by section 104 of the AEDPA govern the resolution of this case. Slack v. McDaniel, 529 U.S. 473, 481 (2000).

2

I

As found by the Virginia Supreme Court on direct appeal, the facts of this case are as follows:

> Beck told police that several days before the murders he formulated a plan to kill [William] Miller, Beck's former employer. On Monday, June 5, 1995, Beck traveled by bus from his home in Philadelphia, Pennsylvania, to Washington, D.C., arriving there at 6 p.m. The following morning Beck went to Arlington to the house shared by [Florence Marie] Marks, Miller, and [David Stuart] Kaplan. He arrived at the house at 11 a.m., "walked around the perimeter," and then broke in through a basement window under the porch.
>
> Wrapping a sledge hammer he found in the basement with a cloth to "muffle the sound," he used the sledge hammer to batter a hole in a door to the first floor of the house. Beck then went to Miller's apartment and chose a .22 caliber semi-automatic pistol from several loaded guns Miller kept in the house; he rejected another larger caliber weapon because its report would be too loud. After loading a spare magazine for the pistol, Beck went to the basement and waited for Miller to return home. As Beck waited he became "nervous," but finally concluded, "I guess I'll go through [with] it."
>
> Later that afternoon, Beck heard the sound of someone entering the basement. Beck raised the pistol to "arm level," and, as the door opened, he closed his eyes and fired two shots. When Beck opened his eyes, he saw Marks on the basement floor. Beck said, "you stupid bitch, why did you have to come home?" In an attempt to make it appear that Marks had been raped and robbed, Beck cut off most of her clothes and stabbed her in the right buttock. He threw a condom he had found in the washer onto the floor and, in a further effort to make it appear that Marks had been sexually assaulted, he kicked her and penetrated her vagina with a hammer. Beck reasoned that sexual assault evidence would

3

lead the police to believe that the crime had been committed by a stranger and not by a family member. Beck then went back upstairs to the first floor.

About one hour later, Miller returned home. Beck was on the stairs leading to the second floor and hid behind the bannister. Miller remained downstairs for a while and then started up the stairs. Beck shot Miller in the face as he mounted the stairs. Miller fell down the stairs as Beck continued to shoot him, firing a total of five rounds at him. Beck put Miller's body in Kaplan's apartment and threw a blanket over the body, "because I got sick and tired looking" at it.

Later that evening, but while it was still light outside, Kaplan returned home to find Miller's body lying in his room, Beck with a gun in his hand, and blood "all over." As Kaplan stared at the scene, Beck shot Kaplan in the back of the head. Beck fired "several times and [Kaplan] just wouldn't die." As Kaplan lay on the floor, he talked to Beck, saying, "hello, I'm awake, hello." Beck fired what he believed was a full magazine at Kaplan and then stabbed him in the head. Beck stated that he "just wanted [Kaplan] to stop having the pain." After he was stabbed, Kaplan appeared to have a "seizure" and then died.

Beck went back through the house taking several guns and two bicycles. He also took cash from each of the victims. He took the keys to Miller's car, changed his clothes, loaded the car with the guns and bicycles, and drove to Washington, D.C., to see a girl. As he left the house, Beck waved to the next door neighbor.

After a parking mishap in the District of Columbia in which Beck parked the car but neglected to engage the parking brake, and the car rolled into another vehicle, Beck drove home to Pennsylvania. Once there he hid the guns and "stashed" the bicycles with a friend. He "cleaned the car of all prints[,] wiped it all down," and abandoned it after covering the license plates.

4

Beck was initially interviewed by Arlington County Police officers at his mother's home in Philadelphia. Beck at first claimed to have been transporting bicycles from Tennessee at the time of the murders. When a friend failed to corroborate Beck's alibi, Beck admitted to police that he had killed Marks, Miller and Kaplan. After his arrest, Beck was returned to Arlington, where he gave a full statement concerning the murders to police. During his statement to the police, Beck was given a chance to say something for himself; he said:

That ah I know what is like to kill somebody, it[']s one of the worst feelings you can live with that I don't know that it is pretty painful that is one of those things that you can't go to sleep and I'm so sorry that I did, I'm so sorry that I had all that anger built up, I should had went to a counselor or something could have prevented it. I don't know, I'm sorry but I know this is going to be pretty hard for people to believe what happened.

In addition to giving that statement, Beck assisted the police in the recovery of the stolen car, guns, and bicycles.

* * *

Autopsies of the three victims revealed that each had suffered multiple gunshot wounds to the head which had resulted in rapid, if not immediate death. Dr. Frances Patricia Field, an assistant chief medical examiner, testified that Marks had sustained two gunshot wounds to the head. Dr. Field concluded that either of these gunshot wounds could have been lethal. In addition, the autopsy revealed that Marks had sustained multiple bruises on her body, a stab wound in the right buttock, and "hyperemia or redness in the left back part of the entrance to the vagina."

Miller's autopsy revealed bruises and abrasions of the lower extremities and several gunshot wounds to the face. Dr. Field concluded that the bullet which entered the left side of

5

the head would have caused death "relatively quick[ly] if not instantaneously."

Kaplan's autopsy revealed the presence of seven gunshot wounds. Kaplan had sustained wounds to the left side of the head, the left and right sides of the face, the left side of the chin, the top and right side of the nose, and the left upper chest. In the medical examiner's opinion, only the bullets which entered the chest and the head below the ear would have been immediately or rapidly fatal. Dr. Field was unable to determine the order in which the wounds had been inflicted.

At the time the plea was taken, in addition to referring the trial court to Beck's statements, the Commonwealth made the proffer that a used condom found in the house was analyzed and that genetic material of both Marks and Beck was found. This evidence was in direct conflict with Beck's statement concerning the rape of Marks.

Beck v. Commonwealth, 484 S.E.2d 898, 901-02 (Va. 1997).

On August 21, 1995, an Arlington County grand jury charged Beck, in separate indictments, with the following offenses: (1) the capital murder of William Miller (Miller) in the commission of a robbery while armed with a deadly weapon, Va. Code Ann.§ 18.2-31(4); (2) the capital murder of David Stuart Kaplan (Kaplan) in the commission of a robbery while armed with a deadly weapon, id.; (3) the capital murder of Florence Marie Marks (Marks), Miller, and Kaplan as part of a single act or transaction, id. § 18.2-31(7); (4) the robbery of Marks, id. § 18.2-58; (5) the robbery of Miller, id.; (6) the robbery of Kaplan, id.; (7) the burglary of the dwelling of Marks, Miller, and Kaplan, id. § 18.2-90; (8) use of a firearm during the commission of the robbery of Marks, id. § 18.2-53.1; (9) use of a firearm during the commission of the murder of Marks, id.; (10) use of a firearm during the commission of the robbery of Miller, id.; (11) use of a firearm during the commission of the murder of Miller, id.; (12) use of a firearm during the commission of the robbery of Kaplan, id.; and (13) use of a firearm during the commission of the murder of Kaplan, id. On February 20, 1996, an Arlington County grand jury charged Beck

6

with three more offenses: (1) the capital murder of Marks in the commission of the robbery or rape of Marks while armed with a deadly weapon, id. § 18.2-31(4), (5); (2) the rape of Marks, id. § 18.2-61; and (3) use of a firearm during the commission of a rape, id. § 18.2-53.1.

Prior to trial, Beck moved to suppress all of the statements he made to the police, as well as all of the evidence obtained as a result of those statements. Following a hearing on the motion, the state trial court denied the motion.

On May 15, 1996, Beck pled guilty to all counts.**4** At the plea hearing, the state trial court found that Beck's pleas of guilty were made knowingly, voluntarily, and intelligently.**5**

At sentencing, the state trial court heard evidence in aggravation and mitigation of the capital murder counts. Based on findings of Beck's future dangerousness and the vileness of the murders, the state trial court sentenced Beck to death on each of the capital murder counts. On the remaining counts, Beck was sentenced to four life terms plus fifty-three years' imprisonment.

On direct appeal, the Virginia Supreme Court affirmed the state trial court's judgment. Beck v. Commonwealth, 484 S.E.2d at 908.**6**

_____

**4** Because he maintained that he did not rape Marks, Beck entered a plea of guilty pursuant to North Carolina v. Alford, 400 U.S. 25, 33, 37 (1970) (A guilty plea is not inconsistent with a claim of innocence because reasons other than the fact that he is guilty may induce the defendant to plead guilty; thus, the defendant "may voluntarily, knowingly, and understandably consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."), to the count charging him with the rape of Marks and the count charging him with the use of a firearm during the commission of a rape.

**5** Subsequently, the count charging Beck with the capital murder of Marks, Miller, and Kaplan as part of a single act or transaction was nolle prossed, and Beck was permitted to withdraw his plea of guilty on that count.

**6** On direct appeal, Beck raised the following claims:

7

On December 8, 1997, the United States Supreme Court denied Beck's petition for writ of certiorari. <u>Beck v. Virginia</u>, 522 U.S. 1018 (1997).

On February 6, 1998, Beck filed a state petition for writ of habeas corpus in the Virginia Supreme Court.[7] Beck's state habeas petition was then supplemented on July 13, 1998. Because the supplemental state habeas petition violated the Virginia Supreme Court's rule on page limitations, on August 4, 1998, the Virginia Supreme Court ordered Beck to file a state habeas petition in accordance with the court's rule on page limitations. On September 3, 1998, Beck filed a state habeas petition that complied with the rules of the Virginia Supreme Court.[8]

_____

> I. The trial court erred in denying defendant's motion to pro-hibit the imposition of the death penalty;
>
> II. The trial court erred in receiving victim impact evidence from individuals who were not related to the victims;
>
> III. The trial court erred in receiving recommendations con-cerning the imposition of the death penalty from the vic-tims' friends and family members;
>
> IV. There was insufficient evidence to support the trial court's finding of vileness;
>
> V. There was insufficient evidence to support the trial court's finding of future dangerousness;
>
> VI. The sentences of death were imposed under the influence of passion, prejudice or other arbitrary factors and are excessive and disproportionate to the penalty imposed in similar cases.

[7] The Virginia Supreme Court has exclusive original jurisdiction over habeas corpus petitions filed by prisoners "held under the sentence of death." Va. Code Ann. § 8.01-654(c)(1).

[8] Beck's state habeas petition alleged the following claims:

> I. Petitioner's plea was not knowingly, intelligently, and volun-tarily entered.
>
> A. The trial court did not inquire into petitioner's psychiat-ric and emotional deficits.
>
> B. The trial court did not adequately inquire into petition-er's understanding of the charges against him.

8

On February 28, 1999, in a one-paragraph order, the Virginia

(Text continued on page 11)
_____

C. The trial court failed to inquire into petitioner's psychiatric medication.

II. The trial court erred by accepting petitioner's <u>Alford</u> pleas.

III. Counsel rendered ineffective assistance regarding petitioner's guilty plea.

A. Counsel unreasonably failed to investigate and litigate petitioner's competency or to obtain any determination of petitioner's competency.

B. Counsel unreasonably failed to move timely for preservation of evidence.

C. Counsel unreasonably failed to request necessary expert assistance.

D. Counsel unreasonably failed to pursue mental health defenses.

E. Counsel unreasonably stipulated to evidence in government's proffer.

F. Counsel unreasonably failed to ensure that the court conducted a proper colloquy.

 1. Counsel unreasonably failed to alert the court to petitioner's educational, emotional, and psychiatric deficits.

 2. Counsel failed to inform petitioner of elements of offenses.

 3. Counsel unreasonably failed to alert the court to petitioner's medication.

G. Counsel unreasonably advised petitioner to plead guilty.

H. Counsel unreasonably failed to move to withdraw petitioner's guilty pleas.

IV. Counsel rendered ineffective assistance regarding sentencing phase.

A. Counsel provided ineffective assistance with respect to petitioner's medications.

9

1. Counsel failed to seek the appointment of a psychiatrist.

2. Counsel unreasonably failed to request expert assistance under Ake v. Oklahoma, 470 U.S. 68 (1985).

3. Counsel failed to object to the court's conclusions regarding medication.

4. Counsel failed to obtain and/or provide information of additional medication prescribed following the plea to the court or the court appointed experts.

5. Counsel unreasonably failed to advise petitioner of the possible legal ramifications of his medication.

B. Counsel unreasonably failed to develop and present a coherent theory of mitigation.

C. Counsel unreasonably failed to object to the Commonwealth's comment on petitioner's failure to testify.

D. Counsel failed to object to prosecutor's use of facts not in evidence.

E. Counsel unreasonably failed to object to the Commonwealth's misstatement of the record.

F. Counsel unreasonably failed to object to the trial court's findings of fact regarding petitioner's post-arrest conduct.

G. Counsel unreasonably failed to object to Dr. Cornell's hearsay testimony.

H. Counsel unreasonably failed to object to court's finding of intent.

I. Counsel unreasonably failed to object to the court's refusal to consider petitioner's cooperation and guilty pleas as mitigating.

V. Counsel rendered ineffective assistance on appeal.

VI. Petitioner's court appointed experts were not qualified and/or performed incompetently.

VII. The death penalty is unconstitutional.

10

Supreme Court dismissed Beck's state habeas petition.**9** With respect to claims I, II, and III, the Virginia Supreme Court dismissed them under the authority of <u>Anderson v. Warden</u>, 281 S.E.2d 885, 888 (Va. 1981) (holding that a petitioner is not permitted to challenge on state habeas the truth and accuracy of representations made by him as to the adequacy of his court-appointed counsel and the voluntariness of his guilty plea unless the petitioner offers a valid reason why he should be permitted to controvert his prior statements). With respect to claims I, II, III, VI, VII, and VIII, the Virginia Supreme Court dismissed them under the authority of <u>Slayton v. Parrigan</u>, 205 S.E.2d 680, 682 (Va. 1974) (holding that a claim that could have been raised at trial or on direct appeal, but was not, is not cognizable on state habeas). With respect to claims IV and V, the Virginia Supreme Court dismissed these claims on the basis that they lacked merit. On April 16, 1999, the Virginia Supreme Court denied Beck's petition for rehearing. His execution was then set for June 10, 1999.

On June 7, 1999, the United States District Court for the Eastern District of Virginia stayed Beck's execution pending consideration of a federal habeas petition. On July 23, 1999, the district court granted Beck's motion for the appointment of experts (a neurologist and a psychiatrist). As a result, Dr. Paul Mansheim and Dr. Thomas Pelligrino were appointed.

On October 1, 1999, Beck filed a petition for writ of habeas corpus in the district court.**10** That same day, Beck filed a motion to expand

_____

> VIII. Petitioner is actually innocent of rape, robbery, and capital murder.

**9** On state habeas, no evidentiary hearing was provided. Sections 8.01-654(c)(1) and (2) of the Virginia Code permit an evidentiary hearing in the circuit court only by order of the Virginia Supreme Court, and then only on the issues enumerated in the order of the Virginia Supreme Court.

**10** In his federal habeas petition, Beck sets forth the following claims:

> I. Petitioner was denied his rights to due process under the Fourteenth Amendment by failure of the Commonwealth to prove each and every element of the crimes beyond a reasonable doubt.

11

the record, a request for discovery, and a request for a hearing. Thereafter, the case was transferred to a United States Magistrate Judge for the preparation of a report and recommendation. 28 U.S.C. § 636(b)(1)(B).

On January 3, 2000, the magistrate judge recommended that the three motions filed by Beck simultaneous with his federal habeas peti-

_____

II. Petitioner's plea was not knowingly, intelligently and voluntarily entered.

A. The trial court did not adequately inquire into petitioner's understanding of the charges against him.

B. Trial counsel was ineffective in that they failed to explain the elements of the crimes charged and unreasonably stipulated to their admission.

C. The trial court erred in accepting petitioner's <u>Alford</u> plea because it was constitutionally flawed.

III. Petitioner's sentencing abrogated his constitutional rights in that the trial court did not receive evidence of petitioner's psychiatric and emotional deficits.

A. The trial court failed to inquire into petitioner's psychiatric medication.

B. Counsel failed to provide the trial court with information enabling it to inquire into petitioner's psychiatric medication.

IV. Trial counsel rendered ineffective assistance by failing to request necessary expert assistance pursuant to <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985).

A. The trial counsel rendered ineffective assistance by failing to request a psychiatrist to explain the effect of petitioner's medications to the court and their ramifications.

B. The trial counsel failed to pursue the issues of petitioner's brain damage.

V. Petitioner was incompetent to appear in court and participate in the proceedings on May 15, 1996 and at the sentencing proceedings; and counsel was ineffective in not bringing this to the court's attention and requesting a competency hearing; and the court did not hold the required hearing.

12

tion, Beck's motion to expand the record, Beck's request for discovery, and Beck's request for a hearing be denied. On March 29, 2000, the district court overruled Beck's objections to the magistrate judge's recommendation of January 3, 2000.

In the interim period, on February 4, 2000, Beck filed a second petition for writ of habeas corpus with the Supreme Court of Virginia, challenging the validity of his arraignment in the Arlington County Circuit Court. On April 28, 2000, the Supreme Court of Virginia denied the petition, finding that Beck had been properly arraigned in Arlington County Circuit Court. Additionally, the Supreme Court of Virginia found that the petition was untimely filed.

On May 5, 2000, the magistrate judge reported and recommended that Beck's petition for writ of habeas corpus be denied and dismissed. On May 30, 2000, Beck filed his objections to the magistrate judge's report and recommendation. Additionally on May 30, 2000, Beck filed a request for an "Evidentiary Hearing on the Issue of Ineffective Assistance of Counsel," a second request to expand the record, a "Request for Hearing on the Issue of Mr. Beck's Competency at the Time of the Sentencing Hearing," and a request for oral argument. The Commonwealth did not file objections to the magistrate judge's report and recommendation, but it responded to Beck's objections. Additionally, the Commonwealth filed an opposition to Beck's motions filed on May 30, 2000.

In an opinion and order dated September 27, 2000, the district court overruled Beck's objections to the magistrate judge's report and recommendation and dismissed Beck's habeas petition. Beck v. Angelone, 113 F. Supp.2d 941, 967 (E.D. Va. 2000). In the same opinion and order, the district court denied Beck's requests for evidentiary hearings, his second request to expand the record, and his request for oral argument. Id.

On November 28, 2000, Beck noted an appeal. On March 12, 2001, Beck filed an application for a certificate of appealability in this court.

II

To be entitled to a certificate of appealability, the petitioner must make "a substantial showing of the denial of a constitutional right."

13

28 U.S.C. § 2253(c)(2). In Slack, the United States Supreme Court clarified § 2253's requirements. Slack, 529 U.S. at 483-84. To make the required showing, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were `adequate to deserve encouragement to proceed further.'" Id. at 484 (quoting Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)).

A

Beck raises three claims related to his competency. The first two claims are substantive competency claims, one contending he was incompetent to appear in court to plead guilty on May 15, 1996, the other contending he was incompetent to appear at the sentencing phase of his case. The third claim is an ineffective assistance of counsel claim, wherein Beck argues that his trial counsel were constitutionally ineffective for failing to alert the state trial court regarding his incompetence. We shall address the two substantive competency claims first and then proceed to the claim of ineffective assistance of counsel.

1

Beck argues that he was incompetent to appear in court to plead guilty on May 15, 1996 and/or at the sentencing phase of his case. The district court held that these claims were procedurally barred because they were not raised in state court. Beck v. Angelone, 113 F. Supp.2d at 966.[11]

As established in Slack, to secure a certificate of appealability on a claim that the district court denied pursuant to procedural grounds, Beck must demonstrate both (1) "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack, 529 U.S. at 484. In conducting this two-prong test, we may

_____

[11] In the alternative, the district court held that these claims lacked merit. Beck v. Angelone, 113 F. Supp.2d at 966.

14

proceed first "to resolve the issue whose answer is more apparent from the record and arguments." Id. at 485.

The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. Pate v. Robinson, 383 U.S. 375, 384-86 (1966). The test for determining competency is whether "[a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). Competency claims can raise issues of both procedural and substantive due process.

For example, a petitioner may make a procedural competency claim by alleging that the trial court failed to hold a competency hearing after the petitioner's mental competency was put in issue. To prevail, the petitioner must establish that the trial court ignored facts raising a "bona fide doubt" regarding the petitioner's competency to stand trial. Pate, 383 U.S. at 384-86. Even if a petitioner is mentally competent at the beginning of the trial, the trial court must continually be alert for changes which would suggest that he is no longer competent. Drope v. Missouri, 420 U.S. 162, 180 (1975). Although there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," proof "of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." Id.

On the other hand, a petitioner may make a substantive competency claim by alleging that he was, in fact, tried and convicted while mentally incompetent. Pate, 383 U.S. at 384-86; Dusky, 362 U.S. at 402. In contrast to a procedural competency claim, however, a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his incompetency by a preponderance of the evidence. Burket v. Angelone, 208 F.3d 172, 192 (4th Cir.), cert. denied, 530 U.S. 1283 (2000). "`Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'" Id. (quoting United States ex rel. Foster v. DeRobertis, 741 F.2d 1007, 1012 (7th Cir. 1985)). Similarly, "neither low intelligence, mental deficiency, nor bizarre,

15

volatile, and irrational behavior can be equated with mental incompetence to stand trial." <u>Burket</u>, 208 F.3d at 192. "Moreover, the fact that the petitioner has been treated with anti-psychotic drugs does not <u>per se</u> render him incompetent to stand trial." <u>Id.</u>

After carefully reviewing the record, we harbor no doubt that Beck was competent to appear in court to plead guilty on May 15, 1996 and at the sentencing phase of his case. First, the circumstances surrounding Beck's statements to the police do not suggest that Beck was incompetent. <u>Id.</u> (circumstances surrounding petitioner's confession relevant to competency determination). A review of the circumstances surrounding his statements to the police reveals that Beck gave rational, responsive answers to the police's questions and was cooperative and able to recall and describe events in detail. As the state trial court found with respect to Beck's statements to the police, "he obviously was aware of exactly what he was doing."

Second, throughout the proceedings, Beck "acted in a manner exhibiting competence." <u>Burket</u>, 208 F.3d at 192. For example, prior to his pleas of guilty, Beck executed a plea memorandum, which outlined the contours of his plea. At the plea hearing, the state trial court conducted an extensive colloquy with Beck concerning the voluntariness and intelligence of his guilty pleas. Beck's replies to the state trial court's questions were clear and responsive. Beck repeatedly demonstrated his understanding of the charges and the trial proceedings. Indeed, in the colloquy with the state trial court, Beck acknowledged that he had discussed the entire plea memorandum with his attorneys, that he understood the nature of the charges against him, that he had discussed the elements of each of the offenses with his attorneys, that his counsel had explained the elements of each of the offenses to him, that he was pleading guilty to all of the charges except two because he was in fact guilty, that he was entering an <u>Alford</u> plea with respect to two of the charges because it was in his best interest to plead guilty to these two charges, that he was waiving certain constitutional rights, and that he understood the possible sentences he could receive. His responses, especially his ones concerning his <u>Alford</u> pleas, reflect "a sophisticated understanding of the proceeding." <u>Burket</u>, 208 F.3d at 192.

Third, throughout the time leading up to Beck's guilty pleas and the sentencing phase of the case, Beck did nothing to lead his counsel

16

or the state trial court to question his competency. Id. at 192-93 (that counsel did not raise the issue of competency provided powerful evidence that petitioner was competent). Indeed, Beck did not express any uncertainty as to what was then occurring and did not act incoherently.

Fourth, neither of Beck's mental health experts nor the Commonwealth's mental health expert indicated that Beck was incompetent to stand trial or assist in his defense. Id. at 193-94 (that the petitioner and prosecution's mental health experts did not indicate that petitioner was incompetent was probative of the fact that petitioner was competent). In preparation for trial, Beck's counsel retained the services of Dr. James Sydnor-Greenberg (Dr. Sydnor-Greenberg) and Dr. Evan Stuart Nelson (Dr. Nelson).

Dr. Sydnor-Greenberg, a clinical psychologist specializing in neuropsychology, administered a full battery of tests which noted certain deficits in particular testing activities, but concluded with a diagnostic impression of attention deficit/hyperactivity disorder (ADHD), dyslexia, and arithmetic learning disability. Dr. Sydnor-Greenberg's report contained no suggestion that these learning disorders rendered Beck in any way unable to understand the proceedings and assist counsel. On the contrary, Dr. Sydnor-Greenberg found that Beck was "alert and oriented," with "no abnormal behaviors noted," and "no severe psychopathology such as severe depression, anxiety, or psychosis."

Dr. Nelson, a licensed clinical psychologist specializing in forensic psychology, conducted nine hours of interviews with Beck, meeting with him in September and October 1995 and February 1996. In June 1996, Dr. Nelson prepared a report of his evaluation of Beck. In his report, Dr. Nelson did not describe Beck as one who was incompetent to stand trial or unable to assist with his defense. Rather, Dr. Nelson described Beck as

> oriented to the date, time, place, and purpose of the evaluation. His ideas were rational and his train of thought was logical. There were no indications of psychosis at any of the interviews. During the first two interviews his mood was somewhat labile, ranging from fear and anxiety to anger and

17

then hopelessness. His emotions were intense and sudden but then subsided or switched almost as abruptly as they appeared. He also spoke rapidly, rambled on, and occasionally wandered off topic. However, Chris was started on a mood stabilizing medication by the jail mental health staff and this was highly beneficial. By the last interview his mood had markedly improved and was stable. There were never any indications of severe depression or suicidal thoughts.

The defendant articulated his words clearly and his speech was easy to understand. He had a low average vocabulary but was able to express himself adequately. His short-term and long-term memory as well as concentration were within normal limits. Because of some peculiarities in the results of his psychological tests with this examiner he was referred for neuropsychological and neurological examinations. While a learning disability and Attention Deficit/Hyperactivity Disorder (ADHD) were diagnosed, no severe abnormalities were noted.

* * *

Chris was able to recollect his actions at the time of the offense and explain many of his thoughts and feelings, but not all of them. He denied being under the influence of drugs or alcohol, denied being physically illness[sic], and denied symptoms of mental illness when they were described to him. From the data available at this time, it is the opinion of the undersigned that the defendant was not experiencing an extreme mental or emotional disturbance at the time of the offense, nor was his capacity to appreciate the criminality of his conduct or to conform his conduct to the law significantly impaired.

In his report, with respect to the topic of mitigating circumstances, Dr. Nelson did not state, let alone imply, that Beck was incompetent; rather Dr. Nelson simply recognized that several factors were potentially mitigating:

18

In the opinion of the undersigned, there are other factors in mitigation relating to the history or character of the defendant which should be considered at the time of sentencing. Chris Beck is a highly immature, undersocialized youth who is the product of an exceptionally poor family situation. His father committed suicide when Chris was 9 years old, his mother was an alcoholic and drug user during Chris' youth, he was shuttled between multiple homes, and there were numerous episodes of physical, emotional, and sexual abuse as well as parental neglect. The consequence of this history of poor parental supervision and inconsistent nurturance is a youth who wants to be liked but feels inadequate, insecure, and has low self-esteem. When he is criticized or rejected Chris responds with intense anger and emotional pain because his pride is fragile and easily wounded. Virtually all of the fights during his youth and his arrests are the consequence of either rejection in a relationship or his feeling emotionally wounded when his self-worth is challenged. He was only 20 years old at the time of the offense and not emancipated from the poor influence of his family evident in his personality at the time. This defendant's sensitivity to rejection and difficulty modulating his emotions was further eroded by ADHD and a learning disability.

There are positive aspects of Chris' personality and history which may be mitigating. For example, the use of mood stabilizing medication while at the jail has been successful in reducing his emotional lability and has improved his capacity to control his emotions when rejected by others. The only significant incident of misbehavior while in the jail awaiting trial was during a time when Chris had stopped his medication. Furthermore, his history in the VisionQuest program for delinquent youths in Pennsylvania clearly documented that with intense supervision and structure Chris can improve his self-esteem, form good relationships, be taught to control his emotions and moderate his response to rejection. This suggests that the structure of prison combined with medication could lead to a well-adapted inmate with a comparatively low risk of significant aggression. As Chris grows older . . . and gets beyond the angst of adolescence

19

his risk of aggression will attenuate even further. When Chris excels at something (thus far only sailing and biking) he works with intensity and dedication. Unlike many other defendants he has no history of significant alcohol or drug use, has consistently sought out employment, is not known to have regularly carried weapons nor to have been engaged in crime as a means of earning his income. He has low-average intelligence and the capacity to be educated to make a positive contribution to the prison environment.

Furthermore, in his testimony at the sentencing hearing, Dr. Nelson did not describe Beck as one who was incompetent or unable to assist with his defense. Rather, Dr. Nelson opined that Beck has a fairly severe learning disability with an IQ in the low average range. Dr. Nelson also opined that Beck has ADHD. According to Dr. Nelson, a person suffering from ADHD has a history of difficulties maintaining attention and a history of hyperactivity. Dr. Nelson further opined that Beck suffers from dysthymia, a "very mild, low level enduring depression." Finally, Dr. Nelson opined that Beck suffers from a personality disorder.

Like the evidence from Beck's mental health experts, the report and testimony of the Commonwealth's mental health expert, Dr. Dewey Cornell (Dr. Cornell), does not indicate that Beck was incompetent to stand trial or unable to assist in his defense. Dr. Cornell is a clinical psychologist and an associate professor at the University of Virginia, who, at the time of his testimony at the sentencing hearing, had conducted over 500 forensic evaluations of criminal defendants. Dr. Cornell met with Beck for seven hours on June 20, 1996. In his report, Dr. Cornell wrote the following concerning Beck's mental status:

> On mental status exam during this evaluation, Mr. Beck presented as an attentive, alert individual not experiencing symptoms of a serious mental disturbance. He did not present noteworthy indications of psychotic thought processes, delusional ideas, or hallucinations. Mr. Beck seemed to enjoy talking to me and had no apparent difficulty communicating and engaging in the evaluation throughout seven hours of interviewing. He even asked if I would come back

20

and talk with him some more. He was somewhat restless and moved quickly from topic to topic, but did not appear to be manic. Others have reported that he enjoys talking about himself and telling stories, so this appeared to be a typical presentation. Although he reported some distress and depression over his current legal situation, he denied active suicidal ideation and in fact laughed and joked during the interview. He claimed to be doing 300 push-ups a day to keep himself in shape and protect himself from inmates. He described a recent fight in great detail, expressing no fear during the confrontation.

Dr. Evan Nelson reported labile mood during his first interviews on 9/21/95 and 10/25/95, but found that Mr. Beck was much more stable after he started mood stabilizing medication. If anything, medication appears to be holding Mr. Beck in the higher range of normal mood. Given his lifelong history of short-tempered and impulsive behavior, it is probably characteristic of Mr. Beck to be somewhat moody and emotionally unstable, but medication still can be helpful.

Thus, neither of Beck's mental health experts nor the Commonwealth's mental health expert indicated that Beck was incompetent at the time of his guilty pleas and/or at the sentencing phase of his case.[12]

In summary, we have carefully reviewed all of the evidence pertaining to Beck's competency at the time of his guilty pleas and at the sentencing phase of his case. The record reflects that Beck was competent at the time of his guilty pleas and at the sentencing phase of his case.[13] Accordingly, because we cannot conclude that "reasonable

_____

[12] In support of his competency claim, Beck relies on the affidavits of Drs. Pelligrino and Mansheim. These affidavits are of no help to Beck because they fall far short of suggesting that Beck was incompetent at the time of his guilty pleas and/or at the time of his sentencing.

[13] Beck argues that he was rendered incompetent at the time of his guilty pleas and at the sentencing phase of his case because of brain damage, the medications he was taking, and bipolar disorder. This argument has no merit. First, the argument ignores the overwhelming evidence that

21

jurists" would find the question of whether Beck was competent at the time of his guilty pleas and/or at the sentencing phase of the case "debatable," Slack, 529 U.S. at 484, we deny Beck's request for a certificate of appealability on his substantive competency claims.**14**

2

Beck also argues that his trial counsel were constitutionally ineffective for failing to raise the issue of competency before the state trial court. This argument has no merit.**15**

The Sixth Amendment provides in relevant part: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The

_____

Beck was competent at the time of his guilty pleas and at the sentencing phase of his case. Second, Beck's allegation of brain damage is refuted by medical testing performed on his brain. An EEG disclosed "right posterior temporal slow activity" but otherwise "no abnormalities." A "CT Scan" showed completely normal results. Third, with respect to the medications Beck was taking, there is no evidence that Beck suffered injurious side effects other than an upset stomach and some sleepiness. Further, Dr. Nelson viewed Beck's medications as a positive, potentially mitigating circumstance, "the use of mood stabilizing medication while at the jail has been successful in reducing his emotional lability and has improved his capacity to control his emotions when rejected by others." Fourth, with respect to Beck's allegations of bipolar disorder, Beck relies on a note allegedly written by a jail doctor on August 15, 1996. The note contains the words "Bipolar D/O." According to Beck, this note suggests that he was incompetent because of bipolar disorder. This note cannot form the basis of a claim of incompetency. This is especially true since the note itself appears to negate such a claim. According to the note, Beck was "smiling appropriately," was "concerned about comments made about his character in court," and "knows all . . . but painful to relive feelings about abuse."

**14** Having concluded that Beck has failed to establish the first prong of the Slack test, we need not address whether the district court was correct in its procedural bar ruling. Slack, 529 U.S. at 484-85.

**15** Of note, in the district court, the Commonwealth expressly waived any reliance on procedural default as a ground for dismissal of this claim.

22

Supreme Court has held that the Sixth Amendment guarantees to all criminal defendants the right to effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).

In general, claims of ineffective assistance of counsel are covered by the familiar two-part test established in <u>Strickland</u>. Under that test, the petitioner first must show that his counsel's performance fell below an objective standard of reasonableness. <u>Id.</u> at 687. Second, the petitioner must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

Beck's claim fails under both prongs of <u>Strickland</u>. With respect to the reasonableness of counsels' performance, the record reflects that counsels' performance was more than reasonable. First, Beck's counsel were aware of the medications Beck was taking and, in view of the close contact they maintained with Beck, were able to assess his capacity to understand the proceedings and assist in his defense. Indeed, in their joint affidavit submitted on state habeas, Beck's trial counsel, Richard McCue and Robert Tomlinson, II, state:

> Soon after being appointed to represent Christopher James Beck, Richard McCue met with Beck at the Arlington Jail. At that time Beck was anxious and upset, as he began to realize the seriousness of the charges against him. We knew that Beck was prescribed medications at the jail for his anxiety. We spoke several times with staff at the jail about Beck's adjustment to his circumstances.

> Throughout our contact with Beck, we had no reason to question Beck's competence to stand trial or plead. He understood the circumstances of the charges, the nature of the various proceedings, what role we played in defending him, and the role of the prosecutor and the court. He was able to assist us in the investigation of his case and he participated fully in discussions about the charges, strategies for trial, and the decision to plead guilty. We did not request a hearing on competency because Beck clearly was competent.

23

Beck did not have family or friends visiting often at the jail. We saw Beck at least once a week, and, as the guilty plea and sentencing approached, every day, to give him some contact with the outside. Throughout our contact with Beck, he remained alert and aware of all matters we discussed. He exhibited no signs of confusion or disorientation. Rather, he complained only of an upset stomach and some sleepiness after taking his medications. On at least one occasion, he refused to take one medication because of his upset stomach.

Second, Beck's counsel explored a potential competency defense through two mental health experts. However, each report negated a claim of incompetence. As Beck's counsels' affidavit notes,

> Dr. Nelson, a clinical psychologist who was appointed to assist the defense, was aware of Beck's medications and suggested no cause for concern or further inquiry as a result of the medications. Our own observations of and interactions with our client gave no signal that Beck's ability to understand and assist in his defense was compromised in any way.

> Prior to trial, we obtained the assistance of Dr. Nelson, and additional evaluations from Dr. James Sydnor-Greenberg and his staff. We worked primarily with Dr. Nelson to assist us with the defense. We spoke with him often as matters developed and consulted with him before he prepared his final report. As the report and investigations note, we had no evidence of brain injury or other mental health disorders that would have provided a defense at a trial.

In short, the record leaves no doubt that counsels' performance concerning Beck's competency was more than reasonable.

With respect to the prejudice prong, Beck was not prejudiced by counsels' decision not to raise the issue of Beck's competency. As discussed herein, the record indisputably demonstrates that Beck was competent at the time of his guilty pleas and at the sentencing phase of his case and, therefore, was not prejudiced by counsels' decision

24

not to raise the competency issue. Accordingly, "reasonable jurists" could not disagree with the district court's determination that Beck's counsel were not constitutionally ineffective for failing to raise the issue of competency before the state trial court. Slack, 529 U.S. at 484. Therefore, we deny Beck's request for a certificate of appealability on his claim that his trial counsel were constitutionally ineffective for failing to raise the issue of competency before the state trial court.

B

Beck also argues that his trial counsel were constitutionally ineffective in that they failed to "explain the elements of any crime" to him. According to Beck, had his counsel explained the elements of his crimes to him, he would not have pled guilty and would have insisted on going to trial. This argument has no merit.[16]

The Strickland ineffective assistance of counsel standard is somewhat different in the context of a guilty plea. In the context of a guilty plea, the petitioner must demonstrate that his trial counsel's performance fell below an objective standard of reasonableness and "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985).

The standard for determining whether a guilty plea is constitutionally valid is whether the guilty plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. Alford, 400 U.S. at 31. In applying this standard, courts look to the totality of the circumstances surrounding the guilty plea, Brady v. United States, 397 U.S. 742, 749 (1970), granting the defendant's solemn declaration of guilt a presumption of truthfulness. Henderson v. Morgan, 426 U.S. 637, 648 (1976) (plurality opinion). The Constitution requires the circumstances to reflect that the defendant was informed of all of the direct consequences of his plea. Brady, 397 U.S. at 755. A plea may be involuntary if the defendant does not understand the nature of the constitutional rights he is waiving, or

_____

16 Of note, the Commonwealth has expressly waived any reliance on procedural default as a ground for dismissal of this claim.

25

unintelligent if the defendant does not understand the charges against him. <u>Henderson</u>, 426 U.S. at 645 n.13.

With respect to counsels' performance, the record indicates that Beck was adequately informed of the nature and consequences of his guilty pleas and understood the charges against him. According to the affidavit submitted by Beck's trial counsel on state habeas, counsel

> discussed the guilty plea with our client, repeatedly, at length, and in great detail. We both have experience with Arlington juries and serious crimes and we both felt it highly likely that an Arlington jury would convict our client and sentence him to death. We discussed the advisability of a jury versus a judge sentencing with other attorneys in the areas, and they concurred that a jury was likely to sentence Beck to death.
>
> We knew from the outset that Judge Newman would try this case, that he had no prior capital case experience, and that he was fair in sentencing in other serious felony cases. We also believed that the evidence in mitigation we intended to present would be more favorably received by a judge than a jury. We recommended to Beck that he plead guilty and have judge sentencing as presenting only a better likelihood of avoiding a death sentence. The decision to plead guilty and have Judge Newman sentence was ultimately Beck's decision, after our recommendation and numerous discussions of the pros and cons of the different options.
>
> We discussed, at length, with Beck the elements of all offenses charged and in detail what the Commonwealth would have to prove to convict him. We discussed the possibility that Beck could avoid a rape conviction, based on his denials of that offense, and the possible effort to defeat the robbery charges on the theory that the taking of property was independent of the killings. We discussed with Beck the fact that his statements included remarks indicating that he intended to take property from the Miller house. The evidence of the taking of Florence Marks' purse and David Kaplan's wallet, easily could be seen as robbery plain and

26

simple and not as an effort to make it "look like robbery." Beck's tearing the wallet from Kaplan's trousers and collecting items to steal as Kaplan arrived, along with other circumstances, made it likely that his conduct would meet the Virginia Supreme Court's definition of robbery in capital murder cases.

We also discussed with Beck the fact that even if we somehow could defeat the robbery and rape components of the charges, we still would be left with a capital murder/multiple murders, where the jury had heard all the same evidence, and still likely would sentence him to death.

Beck participated in the discussions about the offenses, asking relevant and intelligent questions concerning the elements and possible defenses, and clearly understood the issues involved in pleading guilty. He refused to acknowledge guilt in the rape of Florence Marks or the related firearms charge for rape. He pleaded guilty to the capital murder of Florence Marks, understanding that the underlying felony charged was rape or robbery.

Prior to the plea hearing, Beck executed a plea memorandum. The plea memorandum detailed Beck's understanding of his trial rights and the advice he received regarding his pleas, including advice about the charges:

My attorneys have explained to me what the Commonwealth (the prosecutor) must prove in order to convict me of the crime that I am pleading guilty to. I have told my attorneys everything I know about the charges against me. I have discussed with my attorneys any possible defenses I might have to the charges against me.

According to Beck's trial counsel,

[t]he plea memorandum that was executed in connection with the guilty pleas accurately sets out the offenses and the discussions we had with our client. We had the memoran-

27

dum several days before the date the pleas were entered and thoroughly discussed it with Beck. Because we knew of our client's difficulty in reading, we read the agreement memorandum to him and discussed the provisions over and over to make sure he understood everything. At the time he pleaded guilty, Beck knew the significance of his pleas of guilty, he understood the rights he waived, and he made the decision to plead.

At the plea hearing, the state trial court conducted an extensive colloquy with Beck concerning the voluntariness and intelligence of his guilty pleas. Beck's replies to the state trial court's questions were clear and responsive, and Beck repeatedly demonstrated his understanding of the charges and the trial proceedings. Indeed, in the colloquy with the state trial court, Beck acknowledged that he had discussed the entire plea memorandum with his attorneys and that he understood everything contained in it, that he understood the nature of the charges against him, that he had discussed the elements of each of the offenses with his attorneys, that his counsel had explained the elements of each of the offenses to him, that he was pleading guilty to all of the charges except two because he was in fact guilty, that he was entering an Alford plea with respect to two of the charges because it was in his best interest to plead guilty to these two charges, that he was waiving certain constitutional rights, and that he understood the possible sentences he could receive.

In the face of the overwhelming evidence that Beck's plea was knowingly, voluntarily, and intelligently made, Beck relies on an affidavit he submitted on state habeas. In the affidavit, Beck states that his counsel "did not explain the elements of any crime to me." Beck further states:

> My lawyers did not explain to me that capital murder was different than murder. I did not understand that. If I had understood there was a difference, I would not have pled guilty to the capital murder of Florence Marks, because I did not rape her, and I told my lawyers that I didn't rape her. I would not have pled guilty to any of the capital murder charges if I had understood that taking property by itself was not robbery.

28

Beck's reliance on his affidavit is misplaced. "Absent clear and convincing evidence to the contrary," Beck "is bound by the representations he made during the plea colloquy." <u>Burket</u>, 208 F.3d at 191; <u>see also Fields v. Attorney General of State of Maryland</u>, 956 F.2d 1290, 1299 (4th Cir. 1992). Beck has presented no evidence of sufficient evidentiary force to demonstrate that his representations were untruthful or involuntary. <u>Cf. Brady</u>, 397 U.S. at 755 (holding that a guilty plea is made knowingly and intelligently if the defendant is fully aware of the "direct consequences" of his guilty plea and was not induced "by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no relationship to the prosecutor's business (<u>e.g.</u>, bribes)") (citation and internal quotation marks omitted). Beck is, therefore, bound by his representations. <u>Burket</u>, 208 F.3d at 191.

In any event, there is no "reasonable probability" that, but for counsels' alleged errors, Beck "would not have pleaded guilty and would have insisted on going to trial." <u>Hill</u>, 474 U.S. at 59. In trial counsels' opinion, Beck's chances of receiving a life sentence were better if a judge, rather than a jury, sat as the trier of fact. Obviously, if trial counsel had done all that Beck now says they should have, trial counsels' view of the case would not have changed. And, given the overwhelming evidence of guilt, the circumstances of the crime, and the lack of available defenses, we believe that, even absent the alleged errors of counsel, Beck would not have insisted on going to trial.

In summary, "reasonable jurists" could not disagree with the district court's determination that Beck's counsel were not constitutionally ineffective in connection with Beck's pleas of guilty. <u>Slack</u>, 529 U.S. at 484. Therefore, we deny Beck's request for a certificate of appealability as to this issue.**17**

_____

**17** To the extent that Beck continues to press his claim attacking the adequacy of the state trial court's plea colloquy, this claim is procedurally barred because it could have been raised on direct appeal but was not and Beck has not demonstrated cause for his state-court default and prejudice resulting therefrom or that our failure to consider the claim will result in a fundamental miscarriage of justice. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000) (absent cause and prejudice or a miscarriage of jus-

29

III

For the reasons stated herein, we deny Beck's application for a certificate of appealability and dismiss the appeal.[18]

DISMISSED

_____

tice, a federal habeas court will not review any federal claims defaulted in state court); Slayton, 205 S.E.2d at 682 (holding that a claim that could have been raised at trial or on direct appeal, but was not, is not cognizable on state habeas). In any event, we are satisfied that the state trial court's plea colloquy satisfied constitutional minimums.

[18] We also conclude that Beck is not entitled to an evidentiary hearing on any of his claims.

30